## PENNSYLVANIA COMPANY *v.* STALKER, ADMINISTRATRIX.

### [No. 9,404.   Filed April 5, 1918.]

1. COMMERCE.—*Interstate Commerce.*—*Injuries to Servant.*—*Federal Employers' Liability Act.*—*Assumption of Risk.*—In all actions for personal injuries governed by the federal Employers' Liability Act of 1908, §8657 *et seq.* Comp. Stat. 1918, 35 Stat. at L. 65, all state laws upon the subject are superseded, and the defense of assumption of risk is abrogated in certain cases. p. 336.

2. MASTER AND SERVANT.—*Injuries to Servant.*—*Assumption of Risk.*—*Procedure.*—*Federal Employers' Liability Act.*—In an action for personal injuries in a state court coming within the terms of the federal Employers' Liability Act of 1908, §8657 *et seq.* Comp. Stat. 1918, 35 Stat. at L. 65, the procedure is that prevailing in the state courts, and, though what amounts to assumption of risk is substantive law, the method of determining in any case whether an employe has assumed the risk is a question of procedure. p. 337.

3. MASTER AND SERVANT.—*Injuries to Servant.*—*Assumption of Risk.*—*Jury Question.*—Under the settled procedure of Indiana, it is a question of fact for the jury whether an employe assumed the risk of injury, in view of all the circumstances of the case. p. 337.

4. APPEAL.—*Review.*—*Verdict.*—*Answers to Interrogatories.*—*Presumptions.*—In determining whether there is irreconcilable conflict between the general verdict and the answers to interrogatories, the court on appeal must indulge all legitimate inferences and presumptions in favor of the general verdict, and may consider in support of the general verdict any fact provable under the issues and not included in the interrogatories and answers. p. 338.

5. MASTER AND SERVANT.—*Injuries to Servant.*—*Assumption of Risk.*—Being contractual in its origin and nature, assumption of risk will not arise by implication of law from a perilous situation suddenly created. p. 339.

6. MASTER AND SERVANT.—*Injuries to Servant.*—*Assumption of Risk.*—*Evidence.*—In an action for the wrongful death of a railroad employe where decedent was struck and killed by a westbound train running on the east-bound track contrary to custom, evidence *held* not to show that deceased assumed the risk. p. 339.

7. MASTER AND SERVANT.—*Injuries to Servant.*—*Negligence.*—*Instructions.*—In an action for the wrongful death of a railroad employe due to being struck by a train, the giving of an instruc-

tion that where several acts of negligence are sufficiently alleged it is not essential that all of such negligent acts be proved, but there may be a recovery if it is proved that the injury was the result of some one or more of them, was not error, the acts charged being of such a nature that any one of them or any combination thereof might be found to be the negligence which constituted the proximate cause of the injury.   p. 343.

8.   MASTER AND SERVANT.—*Injuries to Servant.—Action.—Conflicting Instructions.*—In an action for the wrongful death of a railroad employe who was struck by a train, an instruction that if decedent failed to obey any rule of defendant of which he had notice, or any instruction given him by his supervisor in defendant's service, and such failure contributed to bring about his injury, it might be considered as bearing upon the question of decedent's contributory negligence, but it would not be a defense to the action, is not erroneous and is not in conflict with an instruction to the effect that it was decedent's duty to exercise reasonable diligence to ascertain the rules promulgated by defendant, as it had the legal right to do, and that if decedent voluntarily failed or refused to conform or comply therewith, he assumed the risk, as the first instruction resting on the proposition that a mere failure to obey a rule amounts to contributory negligence, while the second instruction is based on the proposition that a voluntary violation of a rule amounts to assumption of risk.   p. 348.

9.   APPEAL.—*Review.—Harmless Error.—Instructions.*—Appellant cannot be heard to complain of errors in an instruction which is favorable to him.   p. 349.

10.   MASTER AND SERVANT.—*Injuries to Servant.—Negligence.—Municipal Ordinance.—Police Regulation.*—In an action based on the federal Employers' Liability Act of 1908, §8657 et seq. Comp. Stat. 1918, 35 Stat. at L. 65, for the wrongful death of a railroad employe as a result of being struck by a train, a municipal ordinance prohibiting the running of trains within the corporate limits at a greater speed than ten miles an hour, and fixing a penalty for violations, was admissible as bearing on the question of negligence, since, though all state laws are superseded by the federal statute, the act does not specify what constitutes negligence, but leaves the question to be determined in accordance with the established rules of law.   p. 350.

From Porter Circuit Court; *H. H. Loring,* Judge.

Action by Leona F. Stalker, administratrix of the estate of George Stalker, deceased, against the Penn-

sylvania Company. From a judgment for plaintiff, the defendant appeals. *Affirmed.*

*Leonard, Rose & Zollars,* for appellant.

*E. D. Crumpacker, Grant Crumpacker* and *O. L. Crumpacker,* for appellee.

DAUSMAN, J.—This action was instituted by the appellee against the appellant to recover damages resulting from the death of appellee's decedent, who was killed by one of appellant's passenger trains. Verdict and judgment for appellee in the sum of $1,300.

On September 28, 1913, George Stalker was, and for eight months prior thereto had been, in the employment of appellant as a section man at Valparaiso, Indiana. On said day, and for a long time prior thereto, appellant owned and operated a double-track railroad, extending from the city of Pittsburgh, Pennsylvania, to the city of Chicago, Illinois, through the city of Valparaiso, Indiana. The tracks through Valparaiso run nearly east and west and intersect a number of public streets in said city. One of said streets is known as Franklin street and the next street west of Franklin is known as Washington street. Between said streets and about twelve feet south of the south track was located a toolhouse in which hand cars and tools were stored. Leading from Franklin street to the toolhouse was a cinder path about six feet wide and about six feet south of the south track and running parallel with the track. This path was smooth and had been constructed for the purpose of affording a safe way from Franklin street to the toolhouse. At a point 200 feet east of the toolhouse the tracks curved to the southeast, the curve being

about 900 feet long. There were no buildings on the south side of the tracks near the right of way, and nothing to obstruct the view eastward from said tool house except the gates at Franklin street, the semaphore just east of Franklin street, and the telegraph poles, wires and cross-arms along the south side of the right of way. A person standing in front of the toolhouse near the south line of the track and looking eastward could see an approaching train at a distance of 2,150 feet; and, standing at the same place and looking eastward, could determine on which track the train was approaching at a distance of at least 850 feet. Washington street and Franklin street were guarded by gates. These gates were operated by the tower man in the tower at Washington street. The south gate at Franklin street was equipped with a ratchet gong which rang when the gates were lowered. The tower was equipped with a large dinner bell, and at Franklin street there was an electric gong on an iron pole, and this bell and gong were operated by the tower man when a train approached.

Appellant was engaged in operating passenger and freight trains between Pittsburgh and Chicago. Between fifty and sixty trains ran over its road each day, and from twenty-five to thirty of these were passenger trains. In accordance with the established operating plan, trains going east ran on the south track and trains going west ran on the north track. So perfectly was this plan executed that on one occasion only during Stalker's term of service did a train run west on the south track. But on the morning of September 28, 1913, appellant's passenger train No. 15 was running westward into Valparaiso on the south track, contrary to the custom and against the

current of traffic. This train had been transferred from the west-bound track to the east-bound track at Morgan, a few miles east of Valparaiso, for the reason that the former track was obstructed by a freight train. Train No. 15 was scheduled to arrive at Valparaiso at 5:56 a. m., but on this morning it was running somewhat late and passed the toolhouse between 6:10 and 6:20 a. m.

During the entire period of Stalker's employment he was required to go on an inspection trip over the section on which he worked, with certain other members of the crew, every alternate Sunday morning. For this purpose they assembled at the toolhouse, from which they procured their usual tools and a hand car. The time fixed for starting on these trips was 6:30 a. m. On the morning of said day Stalker left his home intending to go on the usual inspection trip. He took the cinder path at Franklin street and walked westward to a point in front of the toolhouse. Here he stopped and stood momently, looking to the west, and about one foot south of the south track. While in this position he was struck by the locomotive drawing said train, his body was hurled about eighty-five feet, and he was instantly killed. The train was running at the rate of thirty to forty miles per hour, which was its usual speed at that place. The locomo- and could not see Stalker because the locomotive itself obstructed his view in that direction, especially when rounding the curve in the tracks. The fireman was shoveling coal into the fire box and had no opportunity to look ahead. It is customary when coming into a town for the fireman to keep a lookout, and he usually provides for the fire beforehand. The

coal furnished him on that morning was of very poor quality and that made it hard to keep up the fire. Under the company's rules it is the duty of a fireman, when not shoveling coal, to look ahead, and if he should see anybody on the track, it is his duty to inform the engineer, and thereupon it becomes the duty of the engineer to give the warning signal. The warning signal consists of a succession of short blasts of the whistle. The fireman knew that the train was running on the unusual track and against the current of traffic. He was unable to say whether any warning signal had been given, because he was busy with the fire, and he did not see anybody near the track or the toolhouse. The train ran to the station—a few rods west of the toolhouse—where it made the usual stop and then proceeded on its way. Neither the engineer nor the fireman knew of the accident until they were informed of it on their arrival at Chicago. As the train approached, the crossing signal was given at Greenwich street and also at Axe avenue, east of Franklin street, by two long and two short blasts of the locomotive whistle, but the whistle was not blown between Axe avenue and Franklin street. The bell on the locomotive was operated mechanically and it rang continuously from Greenwich street to the place of the accident. When the tower man observed the train approaching he set to ringing the electric gong on the iron post at Franklin street and it continued to ring until the accident. He lowered the gates, and the ratchet bell rang as the Franklin street gates went down. He rang the large bell in the tower, and on observing Stalker's perilous situation, he called to him. To all these warnings Stalker was oblivious.

A person with good hearing, standing where Stalker stood as the train approached, under all the conditions then existing, could have heard all said warning signals, except that he probably could not have heard the calling of the tower man because the train was then too close upon him. Stalker's hearing was good. He could have heard the locomotive bell in time to have moved to a place of safety. Had he looked to the east when the gates were being lowered at Franklin street, he could have seen the train approaching on the south track in time to have moved to a place of safety.

Some time after commencing his work as a section man his foreman warned him that trains were liable to run either way on either track and that he would have to pay diligent attention to the approach of trains from either direction on either track and to keep out of their way. In addition to this oral warning, the foreman gave him a pamphlet prepared by the safety committee and containing information, suggestions and advice, designed for the prevention of personal injuries to railway employes generally. The foreman told him to read the pamphlet and to govern himself thereby. He was able to read and he told his foreman that he would read it. Among other things, the pamphlet contained the following:

> "Make it a rule in getting out of the way of trains to step clear of all tracks. Before stepping on any track look in both directions; trains may be expected on any track coming from either direction at any time."

At the time of the accident there was in full force and effect an ordinance of the city of Valparaiso

which provided that no railway train should be run within the city limits at a higher rate of speed than ten miles per hour.

It is conceded by the parties that at the time of the accident decedent was engaged in interstate commerce. This action, then, is governed by the federal Employers' Liability Act of 1908, §8657 *et seq.* Comp. Stat. 1918, 35 Stat. at L. 65, and the amendments thereto, as to all matters within the purview of said act. We must accept the act as interpreted by the federal courts, and must accept also the law on this subject generally, as evidenced by the decisions of said courts. Since Congress has taken possession of the field of the employers' liability to employes in interstate transportation by rail, all state laws upon the subject are superseded. *Seaboard Air Line Railway* v. *Horton* (1913), 233 U. S. 492, 501, 34 Sup. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C 1, Ann. Cas. 1915B 475.

Section 3 of said act, *supra,* declares that "the fact that the employe may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employe." Section 4, *supra,* declares that the "employe shall not be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employes contributed to the injury or death of such employe."

The Supreme Court of the United States has held that, in abrogating the defense of assumption of risk in certain cases, Congress indicated the legislative intent that in all other cases assumption of risk shall have its former effect as a complete bar to the action.

*Seaboard Air Line Railway* v. *Horton, supra; Jacobs* v. *Southern R. Co.* (1915), 241 U. S. 229, 36 Sup. Ct. 588, 60 L. Ed. 970.

Appellant's first contention is that the trial court erred in overruling its motion for judgment on the interrogatories and answers notwithstanding the general verdict. This contention is based exclusively on the ground that the facts disclosed by the interrogatories and answers compel the conclusion that the action is barred by the doctrine of assumption of risk. Assumption of risk is a substantive issue. It is not a matter of procedure nor a rule of evidence, and therefore the federal act and the decision of the United States Supreme Court constitute the substantive law on this subject; but the procedure is the established procedure prevailing in the courts of this state. *Minneapolis, etc., R. Co.* v. *Bombolis* (1915), 241 U. S. 211, 36 Sup. Ct. 595, 60 L. Ed. 961, L. R. A. 1917A 86, Ann. Cas. 1916E 505.

2.

By the settled procedure of Indiana, whether the deceased assumed the risk of being injured or killed by appellant's train, in view of all the circumstances of the case, was a question for the jury under proper instructions. *Ambre* v. *Postal, etc., Cable Co.* (1908), 43 Ind. App. 47, 86 N. E. 871; *Rogers* v. *Leyden* (1891), 127 Ind. 50, 26 N. E. 210; *Annadall* v. *Union Cement, etc., Co.* (1905), 165 Ind. 110, 74 N. E. 893; *Central Vt. R. Co.* v. *White* (1915), 238 U. S. 507, 35 Sup. Ct. 865, 59 L. Ed. 1433, Ann. Cas. 1916B 252; *Gila Valley, etc., R. Co.* v. *Hall* (1914), 232 U. S. 94, 34 Sup. Ct. 229, 58 L. Ed. 521. As evidenced by their general verdict, the jurors decided that he did not assume that risk. In determining whether there is irreconcilable conflict between

3.

their general verdict and their answers to the
4.   interrogatories we must indulge all legitimate
inferences and presumptions in favor of the
general verdict, and we may consider in support of
the general verdict any fact provable under the is-
sues and not included in the interrogatories and
answers. *Pittsburgh, etc., R. Co.* v. *Lightheiser*
(1906), 168 Ind. 438, 78 N. E. 1033; *Louisville, etc., R.
Co.* v. *Creek* (1892), 130 Ind. 139, 29 N. E. 481, 14
L. R. A. 733; *Catterson* v. *Hall* (1905), 37 Ind. App.
341, 76 N. E. 889; *Illinois Car, etc., Co.* v. *Brown*
(1917), *ante* 315, 116 N. E. 4.

There is no contention that there was an express
agreement whereby the employe assumed the risk of
being injured or killed while in the course of his em-
ployment by any of appellant's trains.   Were the
circumstances such as compel the conclusion that
the law will import into his contract of service a con-
dition whereby he took upon himself the risk of being
injured or killed in the manner disclosed by the
interrogatories?   5 C. J. 1412.   The general rule
announced by the United States Supreme Court, when
stated in language applicable to the case at bar, is as
follows:   An employe assumes the risk of dangers
normally incident to the occupation in which he vol-
untarily engages, so far as these are not attributable
to the employer's negligence.   But the employe has
a right to assume that his employer has exercised
proper care with respect to providing a safe place
of work, and is not to be treated as assuming the
risk arising from a dangerous condition attributable
to the employer's negligence, until the employe be-
comes aware of the danger or unless it is so plainly
observable that he may be presumed to have known

it. Moreover, in order to charge an employe with the assumption of a risk attributable to the employer's negligence, it must appear not only that he knew (or is presumed to have known) of the dangerous condition but that he knew that it endangered his safety; or else the danger must have been so obvious that an ordinarily prudent person, under the circumstances, would have appreciated it. If with this actual or constructive knowledge he remains in the service and encounters the danger he will be held to have assumed the risk. *Gila Valley, etc., R. Co.* v. *Hall, supra,* 101.

Counsel for the company say: "When he assumed a position near the track, he knew there was a liability of trains moving over that track at any time, and when he failed to look eastwardly, he assumed the risk, both of taking the position and the failure to properly exercise his faculties for his own protection."

But, manifestly, in determining whether the employe assumed the risk we should not confine our minds to the events of that morning. Being 5. contractual in its origin and nature, assumption of risk will not arise by implication of law from a perilous situation suddenly created. For the answer we are seeking, we must look to the pertinent events of his entire term of service.

When he entered the service his foreman warned him that trains were liable to run either way on either track at any time, and that he would have to 6. pay diligent attention to the approach of trains from either direction on either track in order to keep out of their way. But he was in the service for a period of eight months, and during that time approximately 13,000 trains ran over his section. Of

this number only one ran on the uncustomary track—adversely to the established custom; and the evidence does not show that he knew of that instance. It may be taken for granted that he had often seen No. 15 pass the tool house, and always on the north track. The regularity of this method of operating trains would tend naturally to lull him into a sense of security by inducing him to believe that there was little probability of trains running contrary to rule. In attempting an explanation of his conduct the thought naturally arises that he was influenced by the belief that the train was running on the north track—the track on which west-bound trains usually ran—and that he did not realize that the approaching train might be running, contrary to the established custom and against the current of traffic, on the south track—the track near which he stood. If he had realized this, it is reasonable to suppose that he would not have walked so near the track and that he would have been more alert. If we exclude the thought of suicide (and that we must do), we are forced to believe that he never appreciated the danger to which he was then exposed.

Was the danger so open and obvious that he ought to have appreciated it? Considering his knowledge of his working place, his experiences and his observations as to the running of trains on the respective tracks, the information and the warning given him as to the likelihood of trains running either way on either track at any time, and his opportunities for estimating the probabilities, ought he to have realized the danger that a perilous situation might arise at any time like that which did arise on that September morning? If so, ought he to have realized that dan-

ger long enough beforehand so that his remaining in the service thereafter would amount to an election to assume the risk? These questions must be answered in the negative. Manifestly the most that the law can impose upon him is a constructive appreciation of the danger involved in the possibility that trains might run either way on either track at any time—not the danger arising out of the identical conditions of that morning.

Was the dangerous condition of the employe's working place on that morning an abnormal one attributable to the negligence of the company's servants in charge of the train? The law imposed on them the duty to exercise reasonable care for the safety of persons on or near the track. The company imposed upon them the duty to look ahead when running within a town, and to give the danger signal if any person should be discovered in the path of the train. The engineer could not see Stalker because the locomotive itself obstructed his view in that direction; and the fireman, contrary to custom, was giving his undivided attention to his fire. Because they saw no one in a place of danger, no danger signal was given. Their train was running blindly, on the uncustomary track, in the central part of a city, and at a high and dangerous speed. Under these circumstances reasonable care may have required the frequent giving of the danger signal as a reasonable or necessary precaution—and precisely because they were unable to keep a lookout ahead. Even the ordinary crossing signal was not given as the train approached Franklin street. Now, we not only have the right, but it is our duty, to presume that, if the danger signal had been given, it would have aroused

Stalker to the danger in time to have avoided it. We presume, also, that if the train had been running at a moderate speed, the man in the tower would have succeeded in making Stalker hear his voice in time for him to have saved himself. And finally, we presume that Stalker had no intention to remain with his face to the west, but that in the natural order of things he was about to turn, or was in the act of turning, when the train struck him, and that he would have turned and saved himself had the train been running at a reasonable speed.

When he stopped at the edge of the south track he was facing the west and was looking in the direction which a proper regard for his safety required him to look before looking elsewhere. That he did not sooner face about and look also to the east, did not heed the blasts of the whistle, the ringing of the bells, the sounding of the gong and the lowering of the gates, and did not step quickly away from his perilous position in time to avoid the collision, are matters bearing on the subject of contributory negligence only.

Having considered all these elements, the jurors decided by their general verdict that the proximate cause of Stalker's death was the negligence of the employer's agents and servants in charge of the train—and that of itself negatives the proposition that he assumed the risk of being killed by that negligence. Under the facts of the case at bar, when negligence stepped in, assumption of risk stepped out; for it must be conceded that if the unfortunate employe ever appreciated the danger arising out of said negligence, he did not remain in the service thereafter. We find nothing in the interrogatories

and answers which is in fatal conflict with the general verdict. *Chesapeake, etc., R. Co.* v. *Proffitt* (1915), 241 U. S. 462, 36 Sup. Ct. 620, 60 L. Ed. 1102; *St. Louis, etc., R. Co.* v. *Brown* (1915), 241 U. S. 223, 36 Sup. Ct. 602, 60 L. Ed. 966; *Texas, etc., R. Co.* v. *Harvey* (1912), 228 U. S. 319, 33 Sup. Ct. 518, 57 L. Ed. 852.

(2)   The court's charge to the jury is voluminous and constitutes seventeen pages of the transcript. It consists of thirty-six consecutively numbered paragraphs, and appellant contends that thirteen of these are erroneous.

The judge of the trial court stated in his own language the substance of the complaint. Following this he told the jurors, in effect, that where several 7. acts of negligence are sufficiently alleged in a complaint it is not essential to a recovery that all the alleged acts of negligence must be proved, but that a recovery may be justified if it is proved that the injury was the result of some one or more of the said acts of negligence. Appellant urges that this constitutes error.

In the case at bar it is not necessary that all the acts and omissions characterized as negligent must have concurred and combined to cause the injury. They are of such a nature that any one of them or any combination of them might be found to be the negligence which constituted the proximate cause of the injury. *Pittsburgh, etc., R. Co.* v. *Broderick* (1913), 56 Ind. App. 58, 71, 102 N. E. 887. When the complaint is considered as an entirety it becomes apparent that it presents but one theory of negligence, viz., the negligent running of the train by appellant's servants in charge thereof. The negligent acts and

omissions of these servants are specified with particularity as follows: (a) That they carelessly ran and operated said locomotive engine and train of cars at said point within the limits of said city at a highly dangerous rate of speed, to wit, at the rate of fifty miles per hour; (b) that they carelessly and negligently failed to maintain a lookout to see whether said decedent or anyone else was on, or in dangerous proximity to, said south track so that they might be warned of their danger; (c) that said engineer and other servants of the defendant in charge of said locomotive engine and train carelessly and negligently failed and omitted to give any signal or warning whatever of the fact that they were running westwardly on said eastbound track, whereby decedent, or anyone else in close proximity to said south main track, might have been apprised of the danger. These averments are followed by the general averment that the accident "was the result solely and entirely of the carelessness and negligence of the defendant and its engineer and other employes in charge of said locomotive engine and train of cars." True, there is in the complaint the averment "that said defendant carelessly and negligently failed to notify or inform said decedent of the fact that said train was running to the westward on the south main track." But this averment may not be considered as an independent and isolated statement, but must be considered in its relation to the entire complaint; and when so considered it is plain that it refers to the failure of the trainmen to warn decedent by giving appropriate danger signals; and in view of the instruction on this point the conclusion is inevitable that the jurors could not have been misled thereby.

We should not be justified in setting out all the instructions. Omitting those of a general character, and those of which no reasonable criticism can be made, the following present fully the real controversy as to the law of the case.

"14. The defendant owed the decedent no duty to run its west-bound train on its north main track nor on any particular schedule. It had the right to operate trains in either direction upon either track, and the decedent had no right to assume that the west-bound train would be operated upon the north main track. This would be true although the defendant usually and ordinarily did run its west-bound trains on said north main track."

"19. If you find that the decedent's death was caused in part by the negligence of the defendant in some one or more of the particulars charged in the plaintiff's complaint and in part by the decedent's own negligence, your verdict should be for plaintiff, unless you further find that the decedent assumed the risk of the defendant's said negligence which so concurred in causing the decedent's death."

"22. If the decedent knew that the defendant was liable at any time to run a west-bound train over the east-bound track, then he had no right to presume that the defendant would not so run a west-bound train over the east-bound track; and if he had such knowledge he would assume the risk of injury occasioned by the running of such train westwardly on the east-bound track in a reasonably careful manner; yet, under such circumstances, he would not assume the risk of the running of such train westwardly over the east-bound track in a negligent and careless manner."

"24. I instruct you that if the employment upon which the plaintiff's decedent entered for the defendant as one of its track men was one involving hazard or danger to the decedent from the operation of trains upon defendant's railroad, then, as one of the terms of his employment, the decedent will be held in law to have assumed and taken upon himself the risk and hazard of injury to himself from those dangers that were ordinarily and usually incident to the employment in which he was engaged. Among the risks which he so assumed was the risk of injury by being struck by trains passing the place of his work on said railroad in either direction without notice and at any reasonable rate of speed, if said trains were operated in an ordinarily prudent manner."

"25. The plaintiff's decedent, George Stalker, assumed the ordinary risks incident to the service in which he was engaged, after the defendant had used care, diligence and caution for his safety and protection, commensurate with the danger to be reasonably apprehended from the service; and if the defendant failed to use such care and caution, and an injury resulted therefrom, it is not a risk incident to the employment, and the defendant is liable therefor, unless the danger is open and apparent or the decedent had actual knowledge thereof."

"26. If the decedent, on the occasion of the injury, failed to obey any rule of the defendant of which he had notice, or any instruction given him by his superior in the defendant's service, and such failure contributed to bring about his injury, it may be considered as bearing upon the question of decedent's contributory negligence, but it would not be a defense to the right of the plaintiff to recover."

"27.  It was the duty of the decedent to exercise reasonable diligence to ascertain the rules, if any, promulgated by the defendant for his conduct while in its employment, and to acquaint himself with them; and the defendant had the legal right to promulgate rules for the conduct of its business and to require the decedent as one of its employes to conform thereto; and if such rules were promulgated and the decedent voluntarily failed or refused to conform or comply therewith, he will be held in law to have assumed all risk of injury occasioned by his failure to conform to such rules."

"30.  Under the law applicable to the issues and evidence in this case the decedent assumed all the ordinary risks incident to the service in which he was engaged and in addition he assumed the exceptional or extraordinary risks of which he had actual knowledge, or which were so plain and obvious that he must have known of them by casual observance.  If you find from the evidence that the decedent knew that trains on defendant's railroad might run over the uncustomary track at almost any time, he is presumed to have assumed whatever risks were incident to the mere running of the train that inflicted the injury, upon the uncustomary track at the time of the injury.  The law provides that a railroad company shall be liable to a servant employed by it in interstate commerce for an injury inflicted upon him while so employed by the negligence of its officers, agents or servants while employed in interstate commerce and while in the line of duty.  In this case the decedent did not assume the risks resulting from the negligence of the officers, agents or servants in charge of the train that inflicted the injury and caused the death

of decedent, if you find that there was such negligence, on the occasion of the injury, unless the decedent knew such negligence in time to avoid the injury.''

"31. If you find that the defendant for some time prior to the death of the decedent ·was accustomed to running its trains over its railroad within the city of Valparaiso at the point where decedent was injured at substantially as high a rate of speed as the train was running at the time it struck and killed the decedent, and that the decedent knew of such custom, or might have known of it by casual observance; and if you further find that such custom was confined to the tracks and the running of trains thereon in the usual manner, I instruct you that such custom does not necessarily establish the fact that decedent assumed the risk of running the train that inflicted the injury at the rate of speed, under the conditions and circumstances, that it was being run, at the time of the injury to him.   *   *   *''

Appellant contends that Nos. 26 and 27 are conflicting; that the former is erroneous; and that the error in the giving of the former is not cured by the giving of the latter, even though the latter be correct. These two instructions are not conflicting. When considered together it becomes apparent that No. 26 rests on the proposition that a mere failure to obey a rule—meaning thereby such a failure as results from forgetfulness, inattention, or carelessness—amounts to contributory negligence. This is a correct statement of the law; and the failure of an employe to obey a known rule promulgated for his safety will prevent a recovery in the absence of a statute eliminating contributory negligence as a

defense in bar. 4 Thompson, Negligence §4624; *Atchison, etc., R. Co.* v. *Reesman* (1894), 60 Fed. 370; 9 C. C. A. 20, 23 L. R. A. 768; 18 R. C. L. 659. No. 27 is differentiated by the words "voluntarily failed or refused." This instruction rests on the proposition that a voluntary violation of a rule—meaning thereby such a violation as is due to wilfulness, obstinacy, or stubbornness—amounts to *assumption of risk*. This is an inaccurate, or to say the least, an infelicitous, statement. The violation of a rule, whether due to thoughtlessness or wilfulness, goes to the question of negligence. *Gleason* v. *Detroit, etc., R. Co.* (1896), 73 Fed. 647, 19 C. C. A. 636; *Lake Erie, etc., R. Co.* v. *Craig* (1897), 80 Fed. 488, 25 C. C. A. 585. It may be that the voluntary violation of a rule ought to be something other than negligence, but certainly it cannot give rise to the concept known in law as *assumption of risk*. Furthermore, this instruction is not appropriate for the reason that the pamphlet introduced in evidence does not purport to be a "book of rules." The so-called rules contained therein are not rules at all; that is to say, they were not promulgated by the company as positive and peremptory rules or regulations for the purpose of controlling the conduct of its employes, or defining their duties, or fixing the scope of their employment. They are mere suggestions and warnings intended to aid the employes in looking out for their own safety by the exercise of judgment, skill, and diligence; and a failure to observe them is not negligence *per se.* 9. *Lake Shore, etc., R. Co.* v. *Parker* (1890), 131 Ill. 557, 23 N. E. 237. But the error in the giving of instruction No. 27 is favorable to appellant and

harmful to appellee, and appellant cannot be heard to complain thereof.

We shall not enter upon a further detailed discussion of these instructions. We deem it sufficient to say that they fairly state the law applicable to the facts of the case, and that appellant's criticisms are not well taken. *Shields* v. *State* (1897), 149 Ind. 395, 406, 49 N. E. 351; *Vandalia R. Co.* v. *Stevens* (1918), *ante* 238, 114 N. E. 1001, 1008; *Chicago, etc., R. Co.* v. *Lake County Savings, etc., Co.* (1917), 186 Ind. 358, 114 N. E. 454; §700 Burns 1914, §658 R. S. 1881.

There is some confusion in the instructions with respect to assumption of risk and contributory negligence; but the inaccurate statements in this regard are all favorable to appellant.

Appellant insists that the court erred in rejecting eighteen of the forty-one instructions tendered. One of these rejected instructions is in the following language: "38. Certain provisions of an ordinance of the city of Valparaiso have been introduced in evidence on the trial of this cause. I now instruct you that these provisions of such ordinance are not to be considered by you for any purpose, and they are withdrawn from your consideration.

The provisions of the ordinance to which said rejected instruction refers, are the following:

"Section 79. It shall be unlawful for any person having control of any engine or train of cars on any railroad running within the limits of said city, to run such engine or train of cars at any point within the said city at a greater rate of speed than ten miles per hour."

"Section 89.   Any person or persons who shall violate any of the provisions of this ordinance, to which a special penalty has not been affixed, shall, upon conviction thereof, forfeit and pay to the city for every such offense, any sum not exceeding fifty dollars."

Appellant contends that the refusal to give said instruction No. 38 is error, for the reason that since this action is under the federal statute all state laws and municipal ordinances are excluded from consideration.   We cannot sustain the contention in this sense.   The federal statute declares that employers within its scope shall be liable to their employes for negligence.   It does not specify what shall constitute negligence, but leaves that question to be determined in accordance with the established rules of the law of that subject.   The ordinance does not undertake to regulate interstate commerce or to create any civil liability against the railway company.   It is merely a reasonable exercise of the police power and is designed to promote the safety of persons and property which would be jeopardized by the running of trains at a dangerous speed within the municipality.   We have not been advised that this point has been specifically decided by any federal court; but we are of the opinion that, on principle, such an ordinance ought to be considered as bearing on the question of negligence. *Hennington* v. *Georgia* (1895), 163 U. S. 299, 16 Sup. Ct. 1086, 41 L. Ed. 166; *Employers' Liability Cases* (1911), 223 U. S. 1, 32 Sup. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44; *Lake Shore, etc., R. Co.* v. *Ohio* (1898), 173 U. S. 285, 19 Sup. Ct. 465, 43 L. Ed. 702; *Austin* v. *Tennessee* (1900), 179 U. S. 343, 21 Sup. Ct. 132, 45 L. Ed. 224; *Sligh* v. *Kirkwood*

(1914), 237 U. S. 52, 62, 35 Sup. Ct. 501, 59 L. Ed. 835; *Whitson* v. *City of Franklin* (1870), 34 Ind. 392; *Cleveland, etc., R. Co.* v. *Harrington* (1892), 131 Ind. 426, 30 N. E. 37; *Chicago, etc., R. Co.* v. *Spilker* (1893), 134 Ind. 380, 33 N. E. 280, 34 N. E. 218; *Shirk* v. *Wabash R. Co.* (1895), 14 Ind. App. 126, 42 N. E. 656; *Pennsylvania Co.* v. *Horton* (1892), 132 Ind. 189, 31 N. E. 45.

We may dispose of all the other rejected instructions by saying that, in so far as they state the law correctly, they are covered by the instructions given.

Judgment affirmed. \

NOTE.—Reported in 119 N. E. 163. Master and servant: assumption of risk under federal Employers' Liability Act, Ann. Cas. 1915B 481; operation and effect of federal act, generally, 48 L. R. A. N. S.) 987, L. R. A. 1915C 49; assumption of risk arising after commencement of employment, 3 Ann. Cas. 814. Railroads, running train on wrong or unusual track as negligence, Ann. Cas. 1917A 936. See under (1) 12 C. J. 17; (2) 26 Cyc 1180; (5) 26 Cyc 1177.