KURN et al. v. WEAVER.—161 S. W. (2d) 1005.

Western Section.    April 6, 1940.

Petition for Certiorari denied by Supreme Court, June 29, 1940.

560

Canada & Russell and Cooper Turner, Jr., all of Memphis, for plaintiff in error.

Lowell W. Taylor and R. G. Draper, both of Memphis, for defendant in error.

ANDERSON, J. This suit was instituted under the Federal Employers' Liability Act, 45 U. S. C. A., sec. 51 et seq., by Werlein Weaver, administratrix of the estate of Bertha Weaver, deceased, against J. M. Kurn and John G. Lonsdale, trustees, who were operating the property of the St. Louis & San Francisco Railway Company by virtue of their appointment in connection with re-organization proceedings of that company under the Bankruptcy Act, 11 U. S. C. A., sec. 1 et seq. The object of the suit was to recover damages for the death of the plaintiff's intestate who was struck and fatally injured Wednesday, August 6, 1936, by the engine of a freight train being operated in interstate commerce by other servants of the defendant. At the time of her death, Mrs. Weaver, the plaintiff's intestate, who was also her mother, was employed by the defendants as a telegraph operator at Dora, Alabama, and it is conceded that rights and obligations of the parties are to be measured by the Federal Act. There was a verdict for the plaintiff in the sum of $20,000 which was reduced to $12,836.62 by virtue of the suggestion of a remittitur by the trial judge and its acceptance by the plaintiff. A judgment was entered accordingly and the defendants appealed in error. We are confronted with 47 assignments of error, which, even if it were practicable within anything like reasonable limits of an opinion, it it would serve no useful purpose to treat separately and in detail.

Defendants assert that under the applicable federal statute, "the fellow servant doctrine is abolished as a defense; contributory negligence mitigates and does not bar a recovery; and assumption of risk is a bar as at common law (except where there has been a violation of certain Federal safety statutes such as the Safety Appliance Act, [45 U. S. C. A., sec. 1 et seq.], not involved here."

The plaintiff does not controvert that this is the correct interpretation of the applicability of the act as it stood at the time the accident here involved occurred.

It is expedient to first dispose of a question of practice raised by the defendants. They insist, to quote from the brief, "that the suit being governed by the Federal statute, the question as to whether there is sufficient evidence to go to the jury and whether there is sufficient evidence to support a verdict are to be determined by the Federal decisions and should the appellate court decide that while there was some evidence requiring the case to go to the jury, still the evidence is insufficient to support a verdict, it should set the verdict aside and grant a new trial."

■ This is nothing more nor less than a contention that this court should weigh the evidence. We do not think that this is the rule in the appellate federal courts and we know it is not the rule in the courts of this state, whose rules and decisions are controlling with respect to such questions of procedure notwithstanding that the substantive rights of the parties are controlled by the provisions of the Federal Employers' Liability Act. See Luck v. Louisville & N. R. R., 167 Tenn., 350, 69 S. W. (2d) 899; Nashville, C. & St. L. R. R. v. Hines, 20 Tenn. App., 1, 94 S. W. (2d) 397, and cases cited; Rocco v. Lehigh Valley R. Co., 288 U. S., 275, 53 S. Ct., 343, 77 L. Ed., 743; Chesapeake & O. R. Co. v. De Atley, 241 U. S., 310, 317, 36 S. Ct., 564, 60 L. Ed., 1016, 1021. See, also, Roberts Federal Liability of Carriers, Vol. 2, Sec. 812, p. 1563, and Sec. 1031 et seq.

■ ■ Under the practice in this state it is the function of the trial judge, upon consideration of the motion for a new trial, to determine whether the party upon whom the burden of proof rests has supplied the requisite quantum of evidence, and in cases tried with the intervention of a jury his approval of the verdict is conclusive on that question; for the reviewing court considers not whether the required amount of evidence was furnished but only whether the verdict is supported by any material evidence. These rules are too well established to require citation of authority.

At the time the engine struck her, the deceased was attempting to cross the main line of railroad for the purpose of taking a position near an adjacent track known as the "passing track" so as to be able, as the train passed, to hand up to the fireman by means of a hoop loosely attached to a staff, certain train orders that she had been directed to deliver to the crew of train No. 136, west-bound from Birmingham.

It was charged in the declaration that throughout the period of deceased's employment at the station of Dora, this train was operated daily, and customarily came into that station on the "passing track" instead of on the main line, after having entered the former about one mile from the station, and received its orders in the manner above indicated.

The theory of the plaintiff's cause of action was that the existence of this custom gave rise to a duty on the part of the defendants' servants in charge of that train that did not otherwise necessarily exist, to keep a proper lookout and give seasonable warning of the train's approach whenever the custom was departed from, in anticipation that the deceased, in reliance on the custom, might be oblivious of the fact that the train was on the main line and hence subjected to a grave danger in the performance of her duty to deliver any train orders she might have; and that the failure to perform this duty proximately caused the death of plaintiff's intestate. In other words, plaintiff successfully maintained in the trial court that the existence

of this custom and the failure to observe it on the particular occasion here in question, coupled with the physical surroundings, especially the fact that the tracks curved sharply around a bluff just east of the depot, constituted special circumstances rendering inapplicable the general rule to the effect that ordinarily a railroad company owes no duty of keeping a lookout, giving a signal of approach or reducing the speed of trains in anticipation that sectionmen, flagmen and others employed along the line may be found on or near the tracks.

The defenses relied upon in bar of the action, generally speaking, were that the defendants were guilty of no actionable negligence; and that the deceased assumed the risk involved in the conduct that caused her death.

More specifically, the defendant contends in this court that there was no evidence to warrant the conclusion necessarily reached by the jury to the effect that there was such a custom as that relied on by plaintiff, but that if there were, the legal consequences were not such as the plaintiff supposes and as the trial judge held.

It is manifest, therefore, that the existence of the custom and its effect, if it did exist, upon the relative rights and duties of the parties are of vital importance.

Under the practice in this jurisdiction the issues having a factual basis must be disposed of by considering the evidence in the light most favorable to the plaintiff, disregarding that opposed thereto as having been rejected by the jury and trial judge in the exercise of their function to conclusively determine disputed questions of fact. Observing this rule, we proceed to state the material facts which the evidence tended to show.

Dora, Alabama, the station at which the deceased was employed, is a small community in northern Alabama located on the main line of what is commonly called the "Frisco" Railroad, between Birmingham and Memphis. That section of the country is apparently hilly and the railroad tracks in the immediate vicinity are winding. The railroad employees who testified referred to the railroad as running north and south, but the case was briefed and tried upon the theory that the tracks in the neighborhood ran east and west, and as a matter of convenience we will so regard it. The physical layout in the vicinity of the scene of the accident is an important factor. There are a number of tracks lying immediately in front of a station house that faces north and is located about 18 feet south of the main line, which is the southernmost track. Next to this is what is known in the record as the "passing track," which is connected with the main line on the east by means of two switches located at different points, one about 1,275 feet from the station and the other "not quite a mile" from that point. There is also a connecting switch or switches located west of the depot. The "passing track" can be entered by a train from the main line at either point. Facing west, there is a nine

degree curve to the right in the main line immediately east of the station and also in the other six or seven tracks. This curve seems to be the west end of an "S" or "reverse" curve. The topography of the country prevents the full curve from being seen from the station, the tracks bending around a high bluff. One of the defendants' witnesses testified that the station house was located "in the curve," but a number of photographs in the record indicate that this building is located just west of the point where the curve ends, it appearing that the tracks immediately in front of the station house are straight. The existence of this curve in the several tracks is important, but it is unnecessary to more fully describe it.

The several tracks used for switching purposes, as well as the testimony, indicated that the defendants did a very substantial amount of carload freight business at Dora. The deceased, Mrs. Weaver, had been employed by the defendants, or the Railroad Company, for some eighteen years and was a capable, experienced employee, with normal eyesight and hearing. She had been the telegraph operator and station agent at Dora for four years immediately preceding her death. It was a part of her duties to receive train orders by telephone from the defendants' train dispatcher and deliver these to the trainmen. Very frequently, if not always, such orders were delivered to an engineman as his train went by the depot without stopping. To accomplish a delivery in this manner the deceased had a staff with a hoop attached to it, to which she affixed the order. With this in hand, she would take a position near the track, hold up the hoop, and a man standing on the engine would reach his arm through the contrivance as he passed, thus snatching it and the order without the train having been stopped.

Among others, the defendants operated daily a freight train known as No. 136 between Birmingham, Alabama, and Amory, Mississippi. This train was scheduled to leave Birmingham at 4 A. M. and arrive at Dora at 5:07 A. M. However, it usually arrived at that point between 5:15 and 5:30 A. M.

There was maintained at or near the station a signalling device known as a semaphore, by means of which the deceased would notify the crew of an approaching train to either stop at the station or get orders before leaving the station in the manner above mentioned. On August 26, 1936, some time prior to the scheduled arrival of train No. 136, the deceased had received from the defendants' dispatcher certain orders to be delivered to the crew of that train and she accordingly lowered the signal to a horizontal position (which signified as above indicated), placed the orders on her hoop and, as the train approached, left the station house for the ostensible purpose of taking her stand near the track so as to be able to place the hoop in reach of the fireman as the engine passed her. Upon leaving the station house she looked neither to the right nor to the left but, with

staff in hand, proceeded across the intervening space to the track, entered upon the main line and had almost crossed it when the engine struck her, either on the leg or the foot, knocking her to the ground and causing the injuries from which she died shortly thereafter.

The defendants' train was composed of an engine and sixty cars, including a caboose, being approximately one-half mile lóng. As it entered the station grounds it was traveling at a speed of from 20 to 30 miles per hour, whereas the customary speed under the same circumstances was about half that. The engineer had already partially applied the brakes, for it was the intention of the crew to proceed to a switch located west of the station connecting the main line with the side track or tracks, there to stop the train, cut loose 16 cars, and, with the engine back them onto one of the side tracks, leave six of them, then enter the main line and hook up with the train again and proceed on the journey to a nearby station where they had orders to meet a passenger train that was frequently met at Dora. Neither the engineer nor the fireman was aware that Mrs. Weaver had been hit until the fireman observed an emergency signal given by someone near the scene who had witnessed the tragedy. He immediately communicated this to the engineer who made a further emergency application of the brakes, bringing the train to a stop about six car-lengths, or in the neighborhood of 240 feet, west of the station. Deceased was found in an unconscious condition at the east end of the sixth car from the engine. As stated, she died shortly thereafter without having regained consciousness.

As the train approached the station the engineer was on the lookout on the righthand side of the engine. He testified that he saw the deceased stepping from the doorway of the station when the engine was about 215 feet east of that point. His view of her was then cut off by the boiler in front of the engine cab, some 52 feet in length, as the train rounded the curve. He did not see the deceased again until after the accident. The fireman was also on the lookout as the train approached the station but because of the curve he could not see the deceased quite as soon as the engineer did. He testified that he saw her when she was 5 or 6 feet from the station door and 10 or 12 feet from the main line track. Both the fireman and the engineer knew that they were to receive orders from the deceased in the usual manner. As the engine neared the station the fireman got off of his seat-box and went to the rear of the engine in order to get down on the engine steps so as to be in a position to snatch the hoop from the deceased's hand as the engine passed the station. Before leaving his seat he had, as stated, observed the deceased walking from the station door toward the track. When he reached the steps she had disappeared. He testified he thought she had crossed the track, intending to deliver the orders to another member of the crew who he thought to be on the pilot of the engine. As stated, he was unaware that the

deceased had been struck by the engine until he had received the signal above mentioned and acted accordingly.

The plaintiff's evidence was to the effect that one warning signal, consisting of one blast of the whistle, was given for a crossing located 1,000 feet east of the station, and that no other signal, either by means of whistle or bell, or otherwise, was given after that. It was also to the effect that when the deceased reached the end of the cross-ties just before stepping over the south rail of the main line the engine of the approaching train was near what is referred to as the "mail crane" which was shown to be located 200 feet east of the station house door.

It follows that there was some evidence to support the conclusion that the train was operated for a distance of at least 200 feet east of the station without a warning of its approach and without an effective lookout and which knowledge on the part of the enginemen that deceased was approaching the track for the purpose of delivering a train order in the usual manner.

Whether, under the circumstances stated, the failure to warn or to keep a proper lookout constituted actionable negligence depends on whether the defendants owed deceased such a duty and under the facts of the present case this in turn depends on whether there was evidence to support the view that the custom relied on by plaintiff existed. The authorities to support this conclusion are hereinafter discussed.

The plaintiff's contention in the trial court was that the aforesaid custom of train No. 136 to come in on the passing track arose out of two things: first, that it usually met and passed an east-bound passenger train at Dora having "superior rights" and that in order to do this the freight train usually entered the passing track east of the station; and, second, that on every day of the week except Monday train No. 136 either "set out" on the side tracks at Dora cars from its train, or picked up cars from side tracks at that point and put them in the train, and to expedite these operations it came into Dora on said days on the "passing track."

There was oral testimony by the plaintiff's witnesses to the effect that the daily freight train No. 136 and a daily eastbound passenger train known as No. 107, frequently met at Dora, the former uniformly taking the passing track upon such occasions. However, the written records of the defendants showed that these trains met at Dora only 94 times out of the six months immediately preceding the accident and only 139 times during the preceding twelve months' period. On the morning of the accident train No. 136 had received orders at Quinton, Alabama, a few miles east of Dora, to the effect that the passenger train would wait for it at Cordova, 5.9 miles west of Dora, until 5:45 A. M., and would wait at Benoit, 3.9 miles west of Dora, until a stated time.

We think the evidence with respect to the meeting of the passenger and freight trains at Dora was altogether insufficient to establish the custom averred by the plaintiff, even if it could be said, considering the exigencies essentially arising out of and involved in the operation of trains, that a custom could be established by such proof that would affect the relative rights and duties of the defendants and their servants in the manner and to the extent claimed, a point which we do not decide. However, we think the contrary is true with respect to the effect of the uniform practice of train No. 136 to enter the passing track on every day except Monday for the purpose of either leaving cars it had, or picking up others, notwithstanding the contention, very vigorously pressed, that there was no evidence to warrant this conclusion.

It is pertinent to point out that the above-mentioned evidence relative to the meeting of the freight and passenger trains at Dora did not negative the view that on the occasions when there was no such meeting, train No. 136, except on Mondays, nevertheless took the passing track for the other purpose.

The plaintiff introduced a witness, one Wright, a former employee of the Frisco Railroad, who operated a boarding house near the station at Dora. He boarded train crews and testified that it was necessary to have breakfast for one of the crews at or about the time No. 136 came into Dora, and that he knew that for at least a year prior to the accident it invariably came into the station grounds on the passing track on every day of the week except Monday, when it came in on the main line and passed through Dora without stopping. This, he testified, was due to the fact that on Monday that train neither left nor picked up any cars at Dora, but that it did either one or both on every other day of the week. He further testified that "most every day" the deceased had orders for train No. 136 and that except on Monday her practice uniformly was to cross the main line track with her hoop and stand between it and the passing track in order to hand up the orders to the fireman as the train passed on the passing track. This witness' testimony in regard to train No. 136 coming in on the passing track every day except Monday was vigorously disputed by several employees of the defendants. However, one of them, who was also introduced by the defendants, partially corroborated the plaintiff's witness, at least inferentially. He was the train dispatcher, who testified to the effect that train No. 136 "not always had a set-out there," referring to Dora; that "sometimes it goes to other stations to get fills." He was then asked, "I take it from your answer that sometimes it might not even have a set-out," to which he responded, "Sometimes it may not, on Sunday." The inference from this testimony is clear.

▇ Without regard to this, the jury resolved the conflict upon this vital point in favor of the plaintiff, and since there is material

evidence to support it, we are bound to accept the plaintiff's view of the matter. Compare St. Louis & S. F. R. Co. v. Jeffries, 8 Cir., 276 F., 73, and cases cited.

■ It is not amiss to observe, however, that the conclusion reached by the jury on this point is strongly fortified by the failure of the defendants to produce their records, which they undoubtedly had, showing the occasions on which cars were "picked up" or "set out" at Dora by train No. 136 during the period with respect to which plaintiff's witnesses testified, just as they did with respect to the meeting of the passenger and freight trains at that point. From the failure to produce these records it was permissible for the jury and the trial judge to conclude that had they been produced they would have shown a state of facts unfavorable to the defendants' contention and favorable to that of the plaintiff. Western Union Tel. Co. v. Lamb, 140 Tenn., 107, 203 S. W., 752; Fisher v. Travelers' Insurance Co., 124 Tenn., 450, 138 S. W., 316, Ann. Cas. 1912D, 1246.

So, we must consider to have been established a custom on the part of the defendants in the operation of train No. 136 to bring it in on the passing track instead of on the main line on every day of the week except Monday, and since the accident here involved occurred on Wednesday it will be necessary to consider what effect the departure from this custom had upon the relative rights and duties of the parties.

■ Ordinarily a railroad company owes no duty of keeping a lookout, of giving a signal of approach or of reducing the speed of trains in anticipation that sectionmen, switchmen, flagmen, and others employed along the line of tracks may be found upon the track. The very nature of the railroad business demands such a rule.

If it be assumed that deceased belonged to the class of employees contemplated by the rule, still it is recognized that it does not apply where there are special circumstances, or where the presence of employes in a particular place should have been anticipated. Numerous illustrations of the application of this exception to the general rule may be found in the cases cited in the note appearing in 39 C. J. at page 460.

As before stated, it was the contention of the plaintiff that the custom of the train to come in on the passing track, coupled with the physical conditions, was a "special circumstance," taking the case out of the general rule, and giving rise to a duty that did not otherwise exist to keep a lookout for the deceased and warn her of the danger incident to the departure from that custom, which they knew, or should have known, would influence her conduct in taking her stand among or near the tracks to hand up the train order: The defendants' position upon this phase of the case was and is that even if there were a custom such as that relied upon by the plaintiff, it was not a custom established for the benefit of the deceased or the class

to which she belonged and, hence, she was not within the protection afforded by it. The defendants' chief reliance in this connection is the case of Chesapeake & O. Railroad v. Mihas, 280 U. S., 102, 50 S. Ct., 42, 43, 74 L. Ed., 207.

In that case the plaintiff was employed by the railroad company to care for switch lights and lamps along the right of way. He had lived for four years near the switch track and was thoroughly familiar with the switching operations carried on in the yards every day. In connection with his work he used a small car that was kept on the opposite side of the tracks from where he lived. To get the car it was necessary for him to cross these tracks. As he came from his house on the morning of the accident, neither seeing nor hearing train or cars approaching, he proceeded directly from his house, and on his way across the tracks to get the small vehicle he attempted to climb over a coal car that was standing with a number of others on a switch track. While in the act of doing so, a string of nine cars was forcibly propelled by means of a flying switch against the standing cars with such violence that Mihas was thrown between two cars and severely injured.

The plaintiff relied upon an established custom of the railroad company to give due notice or warning to all persons in or about such cars of the moving or shunting of other cars against those standing. He contended that no such warning was given upon the occasion in question. As to this the court said: "The evidence, however, is that the notification or warning was exclusively for persons, not employees, engaged in unloading cars. There was no custom or duty of that kind in respect of employees engaged on or about the tracks. If there was a violation of duty, therefore, on the part of the railway company, it was not of a duty owed to Mihas; and the rule is well established that it is not sufficient for a complainant to show that he has been injured by the failure of another to perform a duty or obligation unless that duty or obligation was one owing to the complainant."

There are many other cases to the same general effect, a reference to which is unnecessary. It may be noted, however, that it is not without significance that in concluding its opinion the court in the Mihas case said: "There is nothing in the record to show that employees engaged in the switching operation knew or had reason to believe that Mihas was in any position of danger. In the absence of such knowledge or ground for belief, they were not required to warn him of the impending switching operation or take other steps to protect him. Toledo, St. L. & W. R. Co. v. Allen, 276 U. S., 165, 173, 48 S. Ct., 215, 72 L. Ed., 513, [517]."

The clear implication is that, had the employees referred to, either known or had reason to know, that the plaintiff was relying on the custom and hence likely to be in a position of danger, there would

have been a duty on their part to give him seasonable warning and that their failure in this respect would have necessitated a different result in that case.

As above indicated, the determinative question before the court in that case was whether one not belonging to a class for whose benefit a custom had been established could base an action of negligence on a violation of the custom. In other words, as to such an one, was a violation of the custom in and of itself, and alone, negligence? The court held that it was not, for the reason that, since the plaintiff did not belong to the class for whose benefit the custom was established, it gave rise to no duty on the part of the railroad company to him, and since no duty existed, none was violated.

This is not the same thing as holding that in departing from an established custom no duty on the part of the railroad company arises toward another whom it knows or has reason to believe is relying in his conduct upon the usual practice being followed, whether he belongs to the class for whose benefit the custom was established or not, and we think that the language of the court last above quoted from the opinion in that case so indicates.

That this is true is further recognized and demonstrated by the United States Circuit Court of Appeals for the Fourth Circuit in the case of Southern Ry. Co. v. Cook, 226 F., 1.

The present case being an action under a federal statute, the question now under consideration we think is controlled by the decision of the latter court in the case of Southern Ry. Co. v. McGuin, 4 Cir., 240 F., 649. In that case it appeared that on the day of the accident McGuin, a section man, was setting stakes on a right of way under the direction of the road engineer. In that vicinity the railroad was double-tracked and owing to a broken rail in the track customarily used by north-bound traffic, a north-bound passenger train was running at or about 35 to 40 miles an hour on the other track that was for the use generally of south-bound traffic. While in a cut or curve, where he could have been able to see the approaching train when it was 661 feet away, McGuin was struck by the engine and killed. The fireman, looking out of the left side of the cab, had seen McGuin walking by the two tracks where he probably would have been struck. He called the engineer's attention to the fact and the latter blew the crossing signal. McGuin then moved out of the fireman's sight and the engineer applied his brakes and blew the alarm signal. The fireman last saw McGuin for an instant 8 or 10 feet from the engine as he was coming across to the left rail of the south-bound track. The engineer testified that when he blew the station signal, McGuin looked over his shoulder, seemed to see the situation, stepped upon the north-bound track, where he was safe and walked on, then looked back to the approaching train, seemed to become confused, started two or three ways in a second and then darted across the

southbound track in front of the engine and was struck when one more step would have put him clear; that as he started across the track the alarm signal was given and the emergency brakes applied. One Miller, however, testified that only the alarm signal was given to McGuin and that at the same moment the emergency brakes were applied. Accepting the latter testimony, the court said it would support a reasonable inference that, if McGuin heard the train, he supposed it to be on the north-bound track and so moved to the southbound track to escape it; that, if the fireman and engineer saw him, they must have seen him on or near the south-bound track; that the engineer gave no signal to warn him of the unusual fact that a north-bound train was approaching on the south-bound track until it was too late for him to escape.

The conclusion was that while running a north-bound train on a south-bound track was not evidence of negligence and all employees of a railroad were bound to take notice of the occasional necessity of such a change in the usual course of operations, nevertheless it was not unreasonable to hold that under the circumstances stated the carrier was guilty of negligence in failing to give a seasonable warning of the unusual event.

The case of Southern Railway Co. v. Cook, 4 Cir., 226 F., 1, 141 C. C. A., 115, was cited as authority for the controlling principle and, as stated by the court, is fully in accord with the conclusion reached. Other cases of more or less similar import are Concannon v. Davis, 123 Me., 450, 123 A., 820; Louisville & N. R. Co. v. Parker, 223 Ala., 626, 138 So., 231; Pennsylvania R. Co. v. Stalker, 67 Ind. App., 329, 119 N. E., 163; Stool v. Southern Pac. Co., 88 Or., 350, 172 P., 101; and Brock v. Mobile & O. R. Co., 333 Mo. 918, 51 S. W. (2d), 100.

The defendants contend that even though the custom existed and a departure therefrom gave rise to a new duty on the part of the defendants with respect to a warning, this duty did not exist until and unless the defendants' servants in charge of the train had actual knowledge, as distinguished from constructive knowledge, of the decedent's peril, and that this is the determinative distinction between the line of cases above referred to and the facts of the present case. This, we think, is a misconception of those cases. Where the plaintiff's cause of action is based upon the doctrine commonly known as that of the "last clear chance," the rule in the federal courts may be as contended for, as is indicated by the case of Wheelock v. Clay, 8 Cir., 13 F. (2d), 972, and similar cases cited by the defendants. As to this, we are not called upon to say, for in the case before us the plaintiff's cause of action does not proceed upon that theory, which presupposes contributory negligence on the part of the plaintiff or his decedent, as the case may be, and supervening negligence on the part of the defendant arising after that of the injured party has terminated

as a causal factor. The violated duty in such case does not necessarily arise from any breach of custom but may exist independently thereof. In other words, we have no doubt that, notwithstanding the general rule that employees occupied in and about the tracks of a railroad are not entitled to the warning of the approach of a train that ordinary care would require with respect to others not belonging to that class; yet, even as to such employees a warning would be required regardless of custom if the peril were actually discovered. See Evans v. Atchison, T. & S. F. Railroad, 345 Mo., 147, 131 S. W. (2d) 604.

An examination of the case of Southern Ry. Co. v. McGuin, supra, and the cases following it above cited, will show that they proceed upon the theory that in view of the custom established in each, the operators of the trains should have anticipated that other employees in reliance upon such custom, would be endangered by a departure therefrom, and this being true, were required to exercise ordinary care to give warning of the danger. It is not the theory of those cases that no duty to warn existed until the danger to another arising from the departure from the custom involved was actually discovered, but that such duty arose when the operators either knew, or by the exercise of ordinary care should have known, that a departure from the usual course would create a hazard to others whose conduct had probably been influenced thereby.

It is perhaps true that in the case of Louisville & N. R. Co. v. Parker, supra, referred to by defendants in this connection, the employees having charge of the train were shown to have actually discovered the peril to the deceased in time to have warned him or to otherwise have prevented the fatal injury, and this may also be true in some of the other cases above cited; but the decision in none of them, we think, turned upon that fact.

We may observe in this connection that the general rule making it unnecessary to give warning to those employed about the tracks does not go upon the theory that employees in charge of trains are absolved from the exercise of ordinary care but upon the idea that those so employed are aware of the constant shifting about of trains and the other exigencies incident to the normal operation of railroads and that this being true the trainmen may proceed upon the assumption that they will look out for themselves and not expect a warning, and, hence, will not be endangered by the movement of the trains without one.

In short, in such situations ordinary care does not require a warning because there is no reason to anticipate danger to those of the class mentioned, the essential basis for the assumption that no danger exists in such instances being the further assumption that such employees knowing of the necessity and frequency of such operations, will be on the lookout without a warning. Such an assumption has no basis in reason as developed by human experience and observation

where there is an operation that is a radical departure from an established custom upon which another employee may be expected to rely and which is reasonably calculated to influence his conduct with respect to his safety in going about his duties. As pointed out in the McGuin case, supra, this conclusion is fully in accord with common sense and we may add is pointed by common experience, which teaches the dulling effect of customary action upon the sense of caution and the springs of human conduct.

The present case furnishes an excellent illustration of this. It is reasonable to assume that the deceased knew the train was approaching before it came into view, because she had set the signal for it to stop or receive orders. The evidence was that she did not look down the track after she stepped from the station door, but walked straight to the main line and attempted to cross. If, as the train came in sight, she looked to the east through the bay window in the station provided for that purpose, the conclusion she reached as the result of her observation was manifestly influenced by the confusing appearance caused by the curving tracks and the fact that the train had theretofore customarily come in on the passing track on that day of the week. To say that her conduct was not influenced by these factors would be to ignore the realities of human experience. Having no reason to believe that a contrary course would be followed, the deceased unconsciously, perhaps, and through force of mental habit, beyond doubt concluded or assumed that the train was coming in on the passing track as was the custom. The uniform practice theretofore followed had eliminated from her consciousness the necessity or advisability that would otherwise have existed of ascertaining definitely by observation just which of the tracks the approaching train was on. If, upon the other hand, she did look and was unable to definitely determine the facts of the situation, the uncertainty was, subconsciously, perhaps, rendered certain in her mind by the knowledge that the train had theretofore customarily come in on the passing track.

We think it a just rule to hold that under the facts above stated the deceased had a right to assume that the defendants' servants in charge of the train, being chargeable with knowledge of the probable effect upon her of the aforesaid custom, would give her warning of any danger resulting from a departure. In other words, having that constructive knowledge, and knowing further that the deceased would attempt to deliver orders to one of them in the usual manner, they should have anticipated that as usual she would attempt to cross the main line just as the train neared the station in the expectation that it was on the passing track and that, relying on the custom, she would not ascertain the contrary by means of observation; and that she would thus be endangered by the approach of the train. Under these circumstances, the duty to keep a proper lookout and

give a proper warning was, we think, clear, both upon reason and upon authority. To so hold is reasonable because in doing so we recognize and give effect to common observation and experience which in truth furnish the test of reasonableness. The authorities we have cited above.

From what has been said it is manifest that there was material evidence to support the conclusion that defendants' servants violated the duty arising out of the above-mentioned custom to keep a proper lookout as the train approached the station and to seasonably warn when it was apparent, or should have been so if there had been a proper lookout, that she was oblivious of the danger and that their dereliction in these respects was a proximate cause of the injuries from which she died.

The next question is whether deceased can be said to have assumed the risk of this negligent conduct on the part of the defendants' servants.

The defendants' contention in this connection is expressed in the brief thus: "We think that no conclusion can be reached other than that an ordinarily prudent person in Mrs. Weaver's circumstances would have observed the train upon the main line track and in so doing would have immediately observed the danger of stepping in front of it and appreciated the risks thereof. And this being true, Mrs. Weaver must be held to have assumed this risk regardless of whether she is shown to have actually known that the train was in the main line track or not. This is, of course, quite apart from the question of contributory negligence and she is not held to have assumed the risk because of her contributory negligence but because of the fact that the danger and risk is so obvious and plainly observable that an ordinarily prudent person would have observed and appreciated them and so it must be presumed that she did."

We can find no merit in this contention. The risk involved cannot be said to have been one normally incident to the performance of the duty in which the decedent was engaged. Upon the contrary, it was an extraordinary danger arising from the negligence of the defendant's servants in the operation of the train. Hence, the deceased was under no duty in the first instance to exercise ordinary care to discover the hazard or the facts that gave rise to it. In going about her work she was entitled to presume that the defendant's servants would exercise ordinary care to warn her of the approach of the train. She cannot be held to have assumed the risk of their failure to do so unless the circumstances that gave rise to the danger and the danger itself were so obvious that an ordinarily prudent person would have observed the one and appreciated the other. Chesapeake & O. R. Co. v. De Atley, 241 U. S., 310, 36 S. Ct., 564, 60 L. Ed., 1016, 1017.

In connection with this phase of the case, as we have already pointed out, the station house and depot seem to have been equipped with a bay window usually found in such places, by means of which the operator inside the station could look in both directions and see an approaching train before leaving the station. Undoubtedly the deceased knew that the train was approaching, and, as we have already said, it is reasonable to assume that she looked out of the bay window and saw the train as it emerged from behind the bluff when rounding the curve.

It was shown however that when coming around the bluff it was very difficult, if not altogether impossible, for one standing at or about the station to distinguish at once whether the train was on the main line or one of the several other parallel tracks adjacent thereto.

It is not contended that Mrs. Weaver entered upon the track with a suicidal intent and could not well be, because the undisputed evidence left it certain that she did her best to get across the track, and succeeded except for one foot. So, the only reasonable theory upon which the tragedy can be accounted for is that, relying at least in part upon the custom aforementioned, Mrs. Weaver thought the train was approaching on the passing track and that it would be necessary in order to deliver the message as the train passed for her to cross the main line and take her stand between the main line and the passing track, as she had done on many occasions before.

As we say, the deceased undoubtedly knew that the train was approaching but the determinative fact is that she did not appreciate the danger involved in that fact considered in connection with her intention to cross the track, because she did not realize that it was coming in on the main line contrary to the custom. Nor do we think it can be said as a matter of law that a reasonably prudent person similarly circumstanced would have become aware of the fact that the train was traveling on the main line without warning. Upon the contrary, the fact that no warning was given was calculated to fortify the assumption that there was no departure from the custom and that the approach of the train gave rise to no danger to one intending to cross the main line.

However this may be, applying the rule of the foregoing cases to the facts before us, the deceased had a right to go about her duties upon the assumption that if train No. 136 departed from the custom and came in on the main line, she would be given seasonable warning of any danger that might result. As already indicated, she was not to be held to the exercise of ordinary care in this connection, which otherwise might or might not have been found to require that she employ in the first instance the sense of sight in caring for her own safety to a greater extent than she appears to have done, and the conclusion was inescapable, we think, that she was not actually aware of the danger arising out of the approach of the train. It is not amiss

to say that the defense of assumption of risk was strongly urged in the McGuin case, supra, as well as in all of the others above cited as being in line with that case and was disallowed in each. See Brock v. Mobile & O. Railroad, supra; Pennsylvania R. Co. v. Stalker, supra.

It follows from what has been said that we think the question of assumption of risk was at least one for proper submission to the jury, and we may observe that it is doubtful whether in any view of the evidence the jury could have justly reached any other conclusion upon that particular phase of the case.

This brings us to the assignment of error dealing with the charge. Many of these have been disposed of by what has already been said and they need not be further noticed.

The 5th and 6th assignments complain of the charge in that it presented two different theories under which the plaintiff would be entitled to recover. It is insisted that the first theory, as stated by the court, conveyed the impression that the violation of the custom relied upon by the plaintiff was in and of itself actionable negligence. This is a misconception. The effect of the charge in this respect was that if the jury found the custom to be as contended for by the plaintiff; that it had been departed from; that no warning signal by whistle or bell was given of the approach of the train; that in the operation of said train in that manner without a warning whistle or bell the defendant's servants were not in the exercise of ordinary and reasonable care; and that this conduct proximately contributed to the death of the deceased; the verdict should be for the plaintiff. In other words, the jury were required, first, to find the thing that gave rise to the duty to warn, namely, the custom and the departure therefrom, then to find that if there was no warning that the failure to give it amounted to negligence, and that such negligence was the proximate cause of the death. In view of what we have above said, there was no error in this.

The second theory of the plaintiff, as charged by the court, of which complaint is made, was to the effect that the defendant's servants were negligent in failing to keep a proper lookout. What we have above said disposes of the challenge to this theory, except the view that it "was not in any manner supported by the evidence or by the pleadings," which we find to be without merit. The facts were charged in the declaration and fully warranted the charge upon both theories. It was not necessary to separate them, but it was not reversible error to do so, especially in view of the special request tendered by the defendant and given by the court to the effect that if the jury found "there was no custom for train No. 136 to come into Dora on the passing track as alleged by the plaintiff, then your verdict should be for the defendant."

The 15th assignment of error challenges that portion of the charge dealing with the question of assumption of risk. The criticism is

that the court confined his instruction to the ordinary hazards inherent in the nature of the deceased's work and, moreover, told the jury that plaintiff did not assume the extraordinary risks arising from the negligence of the defendants' trainmen.

In responding to this criticism the plaintiff contends herself with asserting that if the charge complained of be held in error ''it will be necessary for the Supreme Court of the United States and the courts of last resort of practically all the states to revise, repudiate and overrule an unbroken line of decisions, for that is the law as laid down in a long line of decision by all the courts.''

We do not regard this as an adequate answer to the question raised by this assignment of error. The plaintiff asserts that she has quoted at length from decisions holding that ''the employee does not assume the risk of being injured or killed by the defendants' negligence.'' We do not find the cases that state the rule so broadly and without the proviso to the effect that an employee does assume the risk of negligence of which, and of the danger therefrom, he is aware or that would be obvious to and appreciated by an ordinarily prudent person. All of the cases relied upon by the plaintiff recognize this to be the rule.

However, the instruction complained of was correct as far as it went. It was erroneous, if at all, only in that it failed to state the qualification above referred to. But if it be assumed for the moment that the state of the evidence was such that the omission could be regarded as prejudicial in the sense contemplated by Code, section 10654, forbidding us to reverse a judgment for errors of the nature therein described, which is highly doubtful, we think it was supplied or at least rendered entirely harmless by a special request covering the precise point which an examination of the record discloses was tendered by the defendants and given by the Court in his charge. By this request, the jury were pointedly told in substance and effect that the plaintiff's suit would be barred if the jury should find that the deceased either knew of the risk and appreciated the danger arising from the negligent conduct of the defendants' servants that resulted in her death or if the risk and danger arising therefrom were so obvious that an ordinarily prudent person under the circumstances would observe the one and appreciate the other.

In reaching the above conclusion we have not been unmindful of the decisions in Bruce v. Beall, 99 Tenn., 303, 41 S. W., 445, Citizens' St. Ry. Co. v. Shepherd, 107 Tenn., 444, 64 S. W., 710, and like cases to the effect that a positive error with respect to a material proposition in one part of the charge cannot always be cured by a correct and contradictory instruction subsequently given on the same subject. We are confronted in this case with no such situation, for, as pointed out, the instruction as originally given was correct as far as it went and was in effect merely supplemented and not contradicted by the special request.

Were this not the case, we would be contrained to hold that there was no inconsistency of a character that, in any view of the evidence, could have affected the jury in arriving at a verdict in a manner that prejudiced the defendants' rights.

A number of assignments of error deal with the excessiveness of the verdict and with the portion of the court's charge with reference to how the amount of the verdict should be arrived at, and his action in failing to give certain special requests on this subject.

We have carefully examined that portion of the charge complained of and think there is no reversible error therein. In fact, the trial judge gave a special request tendered by the defendant covering the method by which the amount of the verdict should be arrived at in the event it should be for the plaintiff.

The only damages plaintiff was entitled to recover under the facts of this case were those represented by the pecuniary loss sustained as a result of the death of her mother. The latter were shown to have been fifty-three years old when she died and to have had an expectancy of 18½ years. At the time of her death she was contributing to plaintiff's support at the rate of $75 per month and the evidence warranted the conclusion that had she lived she would have continued such contributions.

With respect to the excessiveness of the verdict the plaintiff contends that in fixing the amount of $20,000 the jury miscalculated the present worth of the future contributions, which, under the evidence, they were warranted in finding the plaintiff might have received had the deceased lived out her expectancy, and that this miscalculation was cured by the suggestion of a remittitur. We think this is a reasonable view of that matter. As to the manner in which the reduced amount was arrived at, it is asserted in the brief of the plaintiff: "When this matter came up on motion for new trial we procured from an insurance actuary the figures as to the amount it would take to provide a fund which would pay plaintiff Seventy-five (75.00) Dollars per month for the term of her mother's life expectancy, to-wit: eighteen and one-half (18½) years. That amount reduced to its present cash value at the rate of three (3%) per cent amounted to $12,836.62. It is true that those figures are not in the record, but it is all a matter of mathematical calculation, and we simply obtained those figures from the insurance actuary because we felt they would be more accurate than if we tried to figure it."

The evidence in the record bearing on the question was developed by the defendants on cross-examination. It related to the present cash value of $900, due at the end of each year during the expectancy of the plaintiff's intestate, whereas, the cash contributions to plaintiff by the deceased were made monthly.

Since the accuracy of the above-quoted statement appearing in the plaintiff's brief relative to the matter being one of mathematical cal-

culation, and the result reached thereby, are not questioned, we are constrained to accept the process and the conclusion at face value as did the trial judge, rather than undertake the labor of testing the accuracy of the mathematical process that we evidently employed. Compare Lincoln County Bank v. Maddox, 21 Tenn. App., 648, 657, 659, 114 S. W. (2d), 821.

But the defendants contend that even so, the damages have not been mitigated on account of the contributory negligence of the plaintiff's intestate.

We have already discussed the evidence bearing on the deceased's conduct, and when it is viewed in the light most favorable to plaintiff, as it must be, we conclude that there was some evidence from which reasonable minds might have reached the conclusion that was manifestly reached by the jury and trial jury on this phase of the controversy.

It would be bootless to re-argue the facts, as the rule of contributory negligence applies thereto. It is sufficient to say that we think the existence of the custom and the right of the deceased to rely thereon, considered in connection with the other circumstances of the case, made it a question for the jury to answer as to whether she exercised ordinary care in the premises. As to this feature of the case, an analogy is to be found in a line of cases in this State holding that the absolute duty to look and listen for the approach of a train which one about to cross a railroad track is ordinarily under, is so far affected by the absence of a crossing flagman from his customary post or the failure of an automatic signalling device to give the usual warning that it is designed to give, that it may be a question of fact for the jury rather than one of law for the court to say whether, and to what extent, ordinary care required the use of either or both of these senses, assuming, of course, that the other circumstances are not of such a nature as to require the question to be determined as one of law. See Tennessee Central Railway Co. v. Gilbert, 131 Tenn., 201, 174 S. W., 812; Southern Railway Co. v. Penley, 175 Tenn., 380, 134 S. W. (2d) 177; Gaines v. Tennessee Central Railway Co., 175 Tenn., 389, 135 S. W. (2d), 441.

The exception to the general rule announced by these cases proceeds upon the theory that while a traveler is not entitled to rely solely upon the indication of safety implicit in the absence of such a flagman or the failure of such signalling device to give warning, either of these factors, where it exists, may be regarded as tending to blunt the edge of caution, and hence go so far toward relieving the traveler from contributory negligence as to make it, in the absence of other controlling circumstances, a question for the jury to say to what extent, if any, he was to be excused from further looking and listening for a train. In a case like the one before us, the existence of the above described custom of the particular train that killed the de-

ceased, to come in on the passing track instead of on the main line, is to be regarded as having the same effect upon the sense of caution of the pedestrian, thus making it a question of fact for the jury rather than one of law for the court, under the facts of this particular case, whether ordinary care required the deceased to do more than she did do to secure her own safety. The underlying reason for the rule is the same in both instances.

Complaint is made that the trial judge, in stating the averments of the plaintiff's declaration, among other things, said that it was therein averred that the deceased died several hours after she was injured, after suffering excruciating pain and anguish. It is asserted that no reference should have been made to that averment because it was stipulated that the deceased was unconscious and suffered no pain at all. The court merely referred to the averments of the declaration and in view of the stipulation it would perhaps have been better to have made no mention of pain and suffering. But the jury certainly could not have understood from the charge that they could allow damages on that account. Even if they had done so, the remittitur would have effectively eliminated any such allowance.

We are referred to the case of Nohsey & Schwab v. Slover, 14 Tenn. App., 42, as sustaining the contention that the verdict should be reduced on a basis of about one-half of the deceased's expectancy. The excerpt from that opinion, as quoted in the brief, is taken from the argument of the court relative to the uncertainty of employment, etc., made in connection with the refusal to declare the verdict in that case excessive. In this case it was for the jury to determine from the evidence to what extent there should be taken into consideration the uncertainty of employment, the uncertainty of life and of good health. The deceased's expectancy was proven in the accepted manner and there is nothing to indicate that there was any uncertainty about the duration of her employment. Upon the contrary, it is a matter of common knowledge that the element of uncertainty in that respect as to the employees of a railroad has been greatly reduced. As to the uncertainty of health and life, that was covered by the proof based on the standard mortality tables which are recognized as affording the best proof of which those questions are susceptible.

It is asserted that the rule in the federal court is that a verdict so excessive as to evince passion, prejudice or caprice cannot be cured by a remittitur but that a new trial must be granted. Assuming this to be true, there is nothing to indicate that the rial judge suggested the remittitur because he conceived the verdict to have been so tainted. Upon the contrary, all indications are that he did so only because he conceived it to be excessive merely, and in this conclusion we concur.

Error is assigned on the action of the trial judge in admitting the testimony of the plaintiff relative to the financial con-

tributions by deceased. The ground of the objection was that the evidence was incompetent under the Code of Tennessee, sec. 9780,[1] prohibiting the admissions of testimony relative to statements and transactions with deceased persons under certain circumstances specified in the statute. We are cited to no authority to support this contention of the defendant and we think there is none. The object of this statute is to prevent the living from testifying against the dead. Death having silenced the one, the law silences the other, the theory being that both or neither must be competent to testify. McDonald v. Allen, 67 Tenn. (8 Baxt.); 446; Bingham v. Lavender, 70 Tenn. (2 Lea), 48; D'Armond v. Baker, 10 Tenn. App., 28.

It has been repeatedly held that the statute is to be strictly construed as against the. exclusion of testimony and cannot be extended to cases beyond its terms upon the idea that they fall within the evil intended to be guarded against. Hughlett v. Conner, 59 Tenn. (12 Heisk.), 83; Rielly v. English, 77 Tenn. (9 Lea), 16; Savage v. Savage, 4 Tenn. App., 277; and cases cited.

Construed in the light of the object sought to be accomplished, we think the provision necessarily contemplates only those cases wherein judgment may be rendered for the representative party and against the proposed witness, or vice versa. It does not comprehend a case wherein no judgment could be rendered either for or against the one called upon to testify, even though a judgment might be rendered for or against the personal representative. See Montague v. Thomason, 91 Tenn., 168, 18 S. W., 264.

In this view, it is clear that the present case is not one wherein plaintiff was an incompetent witness with respect to the matter that was made the basis of the defendants' objection.

Error is also assigned on the action of the court in declining to grant a new trial on the ground of newly discovered evidence to the effect that the plaintiff's witness, Wright, "was a petty thief and crook" and had a bad reputation for truth and veracity. In connection with the motion for a new trial the defendants filed affidavits to this general effect.

This case was tried twice in the Circuit Court. Wright testified on both occasions. Many months elapsed between the two trials. There is no satisfactory explanation of the failure to seasonably produce the evidence now claimed to have been newly discovered. Apart from other questions, the defendants have failed altogether to show the requisite degree of diligence in this connection. See Southwestern Transportation Co. v. Waters, 168 Tenn., 596, 79 S. W. (2d), 1028.

---

[1]Section 9780 of the Tenn. Code of 1932 is as follows: "Proceedings by or against personal representatives and guardians.—In actions or proceedings by or against executors, administrators, or guardians, in which judgments may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate, or ward, unless called to testify thereto by the opposite party."

We have now disposed of, in one way or another, all of the assignments of error raising questions that we regard as material and requiring consideration. Upon the whole case we think there is no reversible error in the record and the result is that the judgment is affirmed at the cost of the defendants.

Ketchum, J., and Adams, S. J., concur.