## HAUPT v. CINCINNATI, N. O. & T. P. RY. CO.—232 S. W. (2d) 598.

Eastern Section.   May 23, 1950.

Petition for Certiorari denied by Supreme Court, August 31, 1950.

(1)

2

L. D. Farrar, T. J. Davis, S. H. Ford, all of Chattanooga, for plaintiff in error.

Whitaker, Hall & Haynes, of Chattanooga, for defendant in error.

HALE, J. This is a suit under the Federal Employers' Liability Act, 45 U. S. C. A., Sec. 51 et seq., for personal injuries. At the close of plaintiff's proof the trial judge sustained defendant's motion for peremptory instructions and dismissed the action. Motion for a new trial was made and overruled. An appeal in the nature of a writ of error was prayed, granted and perfected. The case has been ably briefed and argued before us.

We speak of the parties as plaintiff and defendant. Plaintiff was an employee of defendant in its signal department, engaged in interstate commerce.

On the day of the accident he was instructed by his foreman to go to a storage building and get certain supplies incident to his work. This required the use of a motorcar and it was necessary for him to operate it over what is known as the "interlocking plant", affording access to the station and other terminal facilities in Chattanooga. This was also used by several other railroads serving Chattanooga, viz., The N. C. & St. L., the Southern, the T. A. G., the W. & A., and the A. G. S. Such an arrangement is not unusual and results in economy of operation and conservation of space. As we understand the record, each carrier pays a certain determined charge

for the use of the interlocking plant. Its ownership is not shown in the record. It is obvious that the joint user of this facility by the carriers caused a rather heavy traffic load. This traffic was controlled by two signal towers some 1500 feet apart. The one on the East was operated by and under the exclusive control of the N. C. & St. L. Ry. Co., while the one on the West was operated by and under the exclusive control of the Chattanooga Station Co.

Permission had to be obtained from the nearest tower operator for entry upon the interlocking plant. He would communicate with the other operator by means of telephone and would give or withhold permission as might be required by traffic conditions.

On the day in question, the plaintiff proceeded to the Eastern (N. C. & St. L.) tower and obtained permission from the operator, Castlemen, to go through with his motorcar. While so properly using the interlocking plant and after having covered approximately two-thirds of the distance between the towers, he came to a switch, then, to quote his testimony, the following occurred:

"So coming down, as I near this switch point here, I do observe train movement way down, back down past the tower there (indicating on map), but that's nothing unusual. There's engines moving in that yards at all times. Now then, as I come to these points I see that they are throwed against me. Now that's strange in my opinion, because I had asked permission to use this track, and I should be allowed to go right on down to this place to get our material.

"Was that usual and customary? Yes, sir.

"Was that the way you had been doing this work all the time you'd been going into that yard? Yes, sir.

"Did you ever know that switch to be thrown against you before? Well, if so, it was so seldom I don't remember any exact time it was ever throwed against me.

"Now then you got down to that switch, what did you have to do, and what did you do? Just tell what happened. Well, I tell my helper that we are going to have to set over, that the switch is against us, and so we stop our motorcar and I notice this engine keeps coming closer, and then I observe—we do set the car over, and I looks and see that he's going to come on, if he continues his route he is going to interfere with my route. Now then, I notice the section foreman and some men working almost, let's say just a little south of me there, and he observes the engine approaching and me in these switch points, so he steps out and gives the man the signal to stop.

"Now let me ask you in that connection, if that section foreman working in the yard had not given that signal to the engineer to stop, as you have indicated to the jury, what would you have done and what would you have had to do under the general custom. I would have stepped out in plain view of the engineer and give him the signal to stop myself.

"To stop? Yes, sir.

"Would that have been your duty under the custom? Yes, sir.

"Well, now, when you saw the section foreman give the engineer the signal to stop, tell the jury whether or not, according to custom, the engineer recognized the signal to stop.

"If he did recognize the signal, how would he recognize it? According to custom? By two short blows of the whistle.

"Now was that usual and customary for the engineer to give those signals in recognition of the fact that he received the signal to stop? Yes, sir.

"Now then, did you rely upon that custom and proceed to get your hand car or your motor car over that switch? Yes, sir. I did.

"Now according to custom, was it the duty of that engineer to bring that engine to a stop? Yes, sir.

"How far away was the engineer, the engine, at the time that the signal was given to him to stop? About four hundred feet.

"Four hundred feet? Yes, sir.

"Did he stop? No, sir.

"Now just proceed from that point and tell as to the movements of that engine and the movement of yourself and the motor car, and what happened. Well, right when the section foreman flagged him and he answered, he should stop. I never seen it to fail in my life. I told my helper, I said 'He's going to stop. He's answered.' I said 'We'll go on.' So we proceed on our way. We have a distance not over about ninety or ninety-five feet there to run through clearance, very short distance, and everything looked well. He had answered their signal, but I observed after getting started that this engine does not even check speed, and I observed in a little, just a matter of a very few seconds, that he was getting dangerously close, and it looked very doubtful if I was going to make it out of clearance, so then I said to my helper, I said 'He is not going to stop and we will have to jump,' and then we did jump. I leaped for all I am worth. I am on this side of the motor car, and the track is coming in this way (indicating) that the engine's on, and I have got to jump clear of that track in order to keep this engine from running over me, I can't jump the other side because

the motor car is built up on that side. Something had to be done fast, so I hollered 'We'll have to jump'. He skipped off on the other side. He has good clearance on that side, no obstruction there to interfere with him, but I have to jump and clear this track that this engine is coming in on, and I jump hard and as far as I can, and I hit on the ballast kind of downhill, break this ankle that way (indicating), and in doing so the weight turned it over and moves the bone loose here (indicating), breaks it.

"What foot? Right foot. Then I see I am still dangerously close to the train and I jump up and make an effort to run and make another jump on that broken bone in order to get on the other tracks, and in the meantime, just how close to us it was, I heard the crash of the motor car and the engine going together, and it didn't make it out of the points, and it's a good thing I jumped.

"Did it knock your motor car, or crush it up? Well, I talked to the foreman, and he was telling me about—

"Well, don't tell what anybody told you. It struck your motor car? Yes, sir. I seen it turned upside-down off the bank, and being I wasn't in no shape to go and see about it—In fact of the business, I wasn't much concerned about it.

"I believe you say you went and asked for permission to go in? Yes, sir.

"Was that usual and customary? Absolutely.

"Were you ever permitted to go into that yard without getting permission? No, sir.

"Now if you were instructed by any representative of the railroad company to get permission, who was it? Mr. Sewell constantly reminding us to always check with the towerman before entering these interlocking zones.

"Now if this hadn't occurred and you had gone over safely to the storage house and gotten your load of material and started back, what would have been your duties with respect to this customary method of doing the work? Don't quite understand your question, Mr. Ford.

"Well, if you had gotten your load over there, nothing had happened, and you started back, did you have any duties to perform with reference to the towerman before starting back? Oh, yeah. Oh, yeah.

"Will you kindly explain to the jury what would be your—(interrupting) Well, we would run up the track with our stuff until we were even to this Chattanooga Station tower and we had no phone system, anyway, and so we would get his attention by racing the motor car motor, cutting off the switch, and it would pop. You've had experience with racing one. Cut the motor real quick, and it will pop. Any way we could get his attention. That was one system we use. Of course, after we get his attention we will wave to him, and then he will either wave us to go ahead or either give us a hold, a lookout, you see.

"Notify you to stay where you were? Yes. Stay where he was. He would have give us that (gesturing), you know, and we would know to rest easy a few minutes, maybe something coming in or going out. However, if he gives a highball we would take right off and go on out.

"Was the work at all times carried on by the men in charge of that plant by signals and signs and telephone system and telegraph system? Right.

"Now what did your foreman instruct you? What instruction did he give you about the telephone system, what it was used for, whether or not the tower, both towermen, would communicate with each other? Just

what was said to you about that? Well, always co-operate with the towerman so that he can take care of you. That was the general thing you heard. If you don't cooperate with the towerman, he can't tell where you're going or what you're going to do, and he can't do anything for you, but if you do cooperate with the towerman you have assurance that he will not let anything run over you unexpectedly or interfere with your journey to where you're going.

"Did you or not believe when you got permission to go into this yard that you would be permitted to go through to the tower house without being—.(Continuing) —to the store house, without being stopped on account of some closed switch? Yes, sir. It was talked that from the time I went to the railroad, and had observed it for a year and a half of going through and in and out of the yards on various occasions without any interruption when given authority to go in.

"Do you know whether this towerman you got permission from to go in the yards ever communicated by telephone, telegraph, or any other means, that he'd turned you into the yards? I had no way of knowing that.

"Were you led to believe under the universal custom that that would be done? Yes, sir.

"And had the work been done all the time in that manner? Yes, sir.

"Did the towerman where you got permission give you any information that this switch was closed against you? No, sir."

The engine coming through was the property of the defendant and operated by its employee, Gunter. It is apparent that the allowing of this engine to enter the interlocking plant was caused by the negligence of one or both of these tower operators. This was due to failure

of the human element, not to any mechanical defect or unsafe condition of the place in which the plaintiff was sent.

The suit was brought against the defendant and the Alabama Great Southern Railroad, Chattanooga Station Company, Southern Railway Company, and the N. C. & St. L. Ry. Co., but later a nonsuit was taken as to all defendants except the C. N. O. & T. P. Ry. Co. The reason for this action is not shown in the record.

Without undertaking to discuss each assignment of error, it seems to us that the record presents the following general questions:

(1) Was the defendant liable for the negligence of these towermen?

(2) Did the defendant fail to furnish the plaintiff a safe place in which to work?

(3) Could the jury have found the defendant's engineer guilty of negligence in the operation of the engine in question?

We shall discuss these questions in the order presented.

It is undoubtedly true, as a general proposition of law, that the doctrine of respondeat superior applies only when the relation of master and servant is shown to exist between the wrongdoer and the person sought to be charged with the injury resulting from the wrong. Goodman v. Wilson, 129 Tenn. 464, 166 S. W. 752, 51 L. R. A., N. S., 1116; Core v. Resha, 140 Tenn. 408, 204 S. W. 1149; Keller v. Federal Bob Brannon Truck Co., 151 Tenn. 427, 269 S. W. 914; East Tennessee & Western North Carolina Motor Transp. Co. v. Brooks, 173 Tenn. 542, 121 S. W. (2d) 559.

"While the maxim respondeat superior is often said to be founded upon the principle that one who expects to derive profit or advantage from an act done for

him by another must answer for any injury which a third person may sustain from the doing of that act, the real test of liability is the power or right of control of the employee rather than the benefit which may be derived from his services.'' 35 Am. Jur., Master & Servant, Sec. 539, p. 968.

As was remarked by Judge Lurton in Powell v. Virginia Const. Co., 88 Tenn. 692, 13 S. W. 691, 692, 17 Am. St. Rep. 925, ''in every case, the decisive question is, had the defendant the right to control, in the given particular, the conduct of the person doing the wrong?'' For an analogous case (liability for acts of a ''loaned servant'') see Gaston v. Sharp, 179 Tenn. 609, 168 S. W. (2d) 784.

In the instant case, the record shows without dispute that these towermen were not selected by the defendant; that the defendant did not pay for their services and had no power or right of control over them.

We think this phase of the case was properly disposed of by the trial judge.

It is likewise true that the defendant was under the duty to furnish a safe place in which to work. This does not mean that the employer is an insurer of the premises. Morris Bros. v. Bowers, 105 Tenn. 59, 58 S. W. 328; Moore Coal Co. v. Brown, 166 Tenn. 516, 64 S. W. (2d) 3.

''The word 'place,' within the meaning of the rule that requires an employer to furnish a [safe] place of work, means the premises, or some part of the premises, where the work is done, and does not comprehend mere negligent acts of the fellow servants that render the place dangerous for the time being, as, for example, by way of some transient peril.'' Standard Knitting Mills v. Hickman, 133 Tenn. 43, 179 S. W. 385, 387.

In 35 Am. Jur., Master & Servant, sec 359, page 784, it is said: ''While, as above noted, the employer has generally been held to be liable for injury which has been caused by the act of another employee in failing to make safe the victim's place of working, a distinction has been drawn with respect to what have been characterized as 'operative details' of the employer's business. For example, a railroad company is bound to furnish suitable switches and competent servants to operate them, but the actual operation of the switches is declared to be a duty belonging to the employees of the company, for the negligent performance of which the company cannot be held liable. Similarly, the turning on and off of the electric light in a mill as the exigencies of the business may require under the varying conditions of the natural light has been held not to pertain to the personal duty of the master to furnish a safe place to work, but to be a mere operative detail, the performance of which may be delegated to a servant''.

As we have heretofore pointed out, there was no defect in the physical condition of the interlocking plant. The negligence of one or both of the towermen in allowing both this motor car and engine simultaneously to use this stretch of track created a ''transient peril'' or was an ''operative detail'' which was not inherent to the place itself.

We therefore sustain the holding of the trial judge in this particular phase of the case.

This brings us to the final question as to the negligence of defendant's engineer in the operation of the engine in question.

The declaration charges:

''Defendant on said date caused one of its locomotive engines to be operated by one of its servants, and caused

the same to run on the track and through a switch or switches over and through which plaintiff was led to believe he could run his motor car; and while plaintiff was at one of said switches in said interlocking plant or yards which was closed against him as the result of the violation of said custom and method of work, and while he was making every effort to get over said switch with his motor car, defendant's engineer in charge of said engine approached said switch, and before plaintiff could reach a place of clearance with his motor car he was forced to jump and caused to be injured as stated; and plaintiff says said engineer was in the employ of defendant and that the said engineer by the exercise of reasonable care could have seen plaintiff and said motor car and could have stopped said engine and prevented plaintiff from being injured; and plaintiff says one of the section foremen working in said interlocking plant or yards saw plaintiff's imperiled situation and saw he was in danger of being injured by said moving engine and made efforts by the usual and customary signs and signals to have the engineer stop and/or slow the speed of said engine and prevent the engine from running over plaintiff and said motor car, but defendant negligently failed to stop the engine, and plaintiff says when the usual signal to stop was given aforesaid the engineer gave the usual reply by signal acknowledging the signal to stop and/or check the speed of the engine, and plaintiff says under such circumstances he acted in this extremely dangerous and sudden emergency according to the best of his judgment to avoid being injured.

"Defendant's engineer operated said engine at a negligent rate of speed under the circumstances, and it is averred under the circumstances it was the duty of said engineer to have stopped said engine, and all of which

was usual and customary regardless of what employee in said plant gave such signal, and upon such customary method of doing such work in the yard plaintiff replied.''

This, of course, relates to the conduct of the engineer *after* he entered the interlocking plant.

The learned trial judge seemed to be under the impression that this referred to negligence of the engineer in *entering* the interlock. In disposing of the motion for peremptory instructions he said:

''What about this locomotive backing in there? Well, as I said yesterday, it is my opinion that the approach to the matter of that locomotive is not such an approach as would be made by a third party, other than an employee suing this railroad company. I very carefully asked plaintiff's attorney what his theory was what his argument was as to the reason that this locomotive was there at this time and place and contributed, if it did, to bring about this accident. Now, Mr. Ford, stated without hesitancy, and I think he is entirely sustained in view of his allegations in his declaration, that that negligence did not establish a direct negligence of the railroad company in permitting that locomotive to come into those yards. He said his theory was, he said in effect it was the fault of the east end tower man that that locomotive was shoved in upon the track and was allowed to be at that point at that time and that place.

''Mr. Ford: That is one act of negligence.

''The Court: Yes, that is consistent with your theory stated in your declaration and in your evidence. Therefore, gentlemen, the Court is not going into the question as to whether or not this engineer was or was not negligent in stopping there.

''There is considerable authority I have found on my research, if you gentlemen care to make note of it. Some

was mentioned yesterday afternoon, in the Tennessee case of Kurn v. Weaver, 25 Tenn. App., 556 [161 S. W. (2d) 1005]. That case deals with an action by a Western Union employee against a railroad company. The principal facts are not applicable here, but in that decision, which the defendant quoted and relied upon, the case of C. [Chesapeake] & O. Railroad v. Mihas, United States Supreme Court, 280 U. S. 102 [50 S. Ct. 42, 74 L. Ed. 207]. In that case, as quoted in the Tennessee case, held very clearly that in these railroad employee cases where an employee relies upon a neglect of duty upon the part of the railroad, it must be shown that the regulation or the custom, or the duty is for the employee who is complaining. And that, of course, gets back into an analysis of this evidence here as to the duty that this engine man might have owed this motor car operator within this interlocking plant.

"Now, gentlemen, the Court does not think that is the approach on this matter for the reason heretofore stated that the declaration is laid on the premise, and the evidence introduced here to support it, is on the premise that this negligence, if any, and the Court is assuming that there was negligence, was due to the neglect of duty of the east end tower man, or west end tower man, I believe it was the east end tower man in letting this switch engine, this locomotive into the yards. Mr. Ford says that is his theory, and he is entirely satisfied if that is true.

"Mr. Ford: One of the theories.

"The Court: Yes, I understand. If that is true, and the Court thinks it is, why then the question in that part of the case then reverts back to this fundamental question of the duty this defendant company had in view of the arrangement it had with these other two corporations.

It is the Court's opinion, therefore, that under the law as I understand it, and on the evidence, that a verdict should be directed for the defendant in this case."

Plaintiff, in speaking of the flagging of this engine, said the man who did it, "He flagged them to stop. . . . He seen my position and flagged in my behalf."

Neither the engineer nor the person giving the signal testified. Defendant argues this signal was given for the benefit of the working crew; that "The engineer failed to stop but this failure could be relied upon only by those for whom the stop, insofar as the engineer could see, was intended."

One of the rules of the defendant regarding engineer-men is, "They must obey signals promptly, and if in doubt stop the train. If in switching, the employee giving signals is lost to view, stop the train until he returns."

It was not shown, but assumed, that the engineer was on the proper or right side of the cab. The evidence does not show whether or not there was a fireman. The plaintiff testified this was a "passenger train engine. Big engine. Didn't have any cars." Would this authorize the inference there was a fireman?

■ Can we say the only inference to be drawn from the evidence most favorable to the plaintiff is that the defendant was free of negligence? We think the record on this phase of the case required the issues to be submitted to the jury.

■ Whether or not the plaintiff acted as a reasonably prudent and careful man under the circumstances is also a jury question. Under the Federal Employers' Liability Act, Section 1, 45 U. S. C. A. Section 51, contributory negligence goes only in mitigation of damages.

It results that the case must be reversed for trial on the issue noted. Defendant will pay cost of appeal.