IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 9, 2013 Session

PATSY FREEMAN, PERSONAL REPRESENTATIVE &
ADMINISTRATRIX OF THE ESTATE OF JOHN R. FREEMAN v. CSX
TRANSPORTATION, INC. ET AL.

Appeal from the Circuit Court for Bedford County
No. 12046    Franklin L. Russell, Judge

No. M2012-01335-COA-R3-CV - Filed August 28, 2013

After a lengthy trial, the trial court determined that the decedent was more than 50% at fault
for the collision that resulted in his death. The evidence does not preponderate against the
trial court's findings and we therefore affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL,
M.S., P.J., and FRANK G. CLEMENT, J., joined.

John W. Chandler, Jr., Pamela R. O'Dwyer, and Donald N. Capparella, Nashville, Tennessee,
for the appellant, Patsy Freeman.

John W. Baker, Jr. and Emily L. Herman-Thompson, Knoxville, Tennessee; Evan M. Tager
and Brian J. Wong, Washington, DC; James W. Purcell, Augusta, Georgia; and Robert M.
Anspach, Toledo, Ohio, for the appellees, CSX Transportation, Inc. and Mike E. Martin.

OPINION

FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of an accident that occurred on the morning of April 22, 2003.
John Freeman, a 19-year-old high school student, crossed over the railroad tracks in
Normandy, Tennessee on his way to school. His car was hit by a CSX train, and John died
from the injuries he sustained in that collision. John's mother, Patsy Freeman ("plaintiff"),
as personal representative and administratrix of his estate, brought this wrongful death action

against CSX and the train conductor.[1]

To provide a framework for understanding the case, we will give a basic description of the crossing. (A photograph of the Normandy crossing is included as an appendix to this opinion.) The railroad track that goes through Normandy runs in a north-south direction. Normandy Road runs east and west; traveling in an eastward direction, a driver on Normandy Road passes over Highway 269, which runs parallel to the train tracks on the western side of the tracks, before passing over the railroad tracks. On the eastern side of the tracks, several roads converge. Once it crosses over the tracks, Normandy Road, now Front Street, curves to the north and runs parallel with the tracks. An east-west road, Division Street, approaches slightly to the south of the crossing and then curves up to intersect with Normandy Road/Front Street. Cascade Hollow Road runs north-south and is parallel to the tracks to the south of the crossing; this road ends at Division Street, where a driver can turn right and proceed east on Division Street (going away from the crossing), continue north on Front Street, or turn left onto Front Street and go over the crossing. There is a stop sign at the end of Cascade Hollow Road; the sign is approximately 140 feet from the tracks.

On the western side of the tracks, on a mast located at the southwest corner of the crossing, there was a set of red flashing lights facing toward the west and side lights facing north and south toward approaching traffic on Highway 269. The same mast held a set of east-facing back lights. On the eastern side of the tracks, at the northeast corner of the crossing, there was a mast with a set of east-facing red flashing lights and west-facing back lights. At the time of the accident, there were no side lights on the eastern side of the railroad tracks. The front set of lights on the northeast mast and the back lights on the southwest mast were aligned toward a traffic island separating Front Street and Division Street about 84 feet from the crossing.

On the morning of the accident, the CSX train approached the Normandy crossing from the south proceeding in a northerly direction, and John Freeman drove northward on Cascade Hollow Road toward the crossing. We do not know whether John stopped at the stop sign at the end of Cascade Hollow Road or at what speed he was driving. The lights at the Normandy Crossing are activated when an approaching northbound train triggers a circuit located 2,663 feet to the south of the crossing. Because the train that collided with John Freeman's car was travelling at a speed of approximately 39 miles per hour, the flashing lights at the crossing would have been activated about 36 seconds before the train reached the crossing. The crossing was also equipped with a warning bell that would have been activated at the same time as the flashing lights.

---

[1]The conductor was dismissed from the case on the first day of the trial.

While there is some dispute as to whether the train's engineer employed the prescribed emergency horn pattern, the evidence shows that the engineer began sounding the locomotive horn about 1,660 feet from the crossing and continued to sound the horn continuously thereafter. The train was also equipped with a bell that was activated with the initial blowing of the horn and rang continuously thereafter.

*The trial*

The lawsuit was heard in a bench trial in December 2011 that lasted nearly three weeks and produced many volumes of transcripts and exhibits. We will not attempt to summarize the evidence, but will provide an outline of the testimony and then fill in details as required to address the issues on appeal.

<u>Plaintiff's witnesses:</u>
- Michael Duncan. A nearby resident familiar with the crossing, testified about having a close call one day when approaching the crossing from Cascade Hollow Road.
- Hughie Darnell. Normandy resident, testified on cross-examination that he had never had any problems at the crossing.
- Donald Adcox. Normandy mayor at the time of the accident, testified that, in response to a previous accident at the Normandy crossing, he had called TDOT (Tennessee Department of Transportation) and CSX to inquire about getting crossing bars. Mr. Adcox was on the scene immediately after the accident at issue in this case; when he opened John Freeman's car door, the radio was playing "staticky and loud." On cross-examination, Mr. Adcox testified that TDOT did not install a crossing bar after the previous accident because there was adequate visibility looking down the tracks in both directions. Mr. Adcox also stated that he had never had any problems with visibility or with seeing the flashing lights at the crossing.
- David Rowland. A witness to the accident, testified that all of the horns and bells and warning lights were working at the time of the accident. He further stated that, at times prior to and after the accident when he stopped at the stop sign at Cascade Hollow Road, he could see the flashing lights when they were activated. Mr. Rowland also stated that, when a driver is at the Normandy crossing, the view "is clear down the track."
- Dr. Kenneth Heatherington. Expert witness, transportation and traffic engineer, gave extensive testimony regarding the safety features at the Normandy crossing with a particular focus on the design and visibility of the flashing lights. Using photographs taken by Mr. Freeman, Dr. Heatherington opined that the lights on the eastern side of the crossing did not comply with MUTCD (Manual on Uniform Traffic Control Devices) standards and that, for a driver approaching from Cascade Hollow Road, "their conspicuity in no way would alert motorists that a train is there coming." He

further opined that CSX should have installed side lights aligned toward Cascade Hollow Road. After making certain assumptions about John Freeman's actions (including that he acted as a reasonably prudent driver), Dr. Heatherington also opined that John would not been able to see the front of the train until 1.3 to 1.9 seconds prior to impact. Dr. Heatherington's opinion regarding sight restrictions was based primarily on "head movement limitations," not on visual obstructions around the crossing. Dr. Heatherington was called back as a rebuttal witness. Based upon the testimony of Phil Stephens concerning the alignment of the lights, he opined that John Freeman would not have passed through the 30-degree cone of the front lights on the eastern side of the crossing or of the back lights on the western side of the crossing until 2 to 4.5 seconds prior to the impact.

- Keri Maffei. John Freeman's sister.
- Charles Culver. Expert witness, retired locomotive engineer and conductor, evaluated the actions of the engineer. Based upon the event recorder, Mr. Culver opined that the engineer had failed to sound the horn at the whistle post and to use the required horn pattern.
- David Lipscomb. Expert witness, audiologist, testified about the audibility of the horn and bell prior to the accident. According to Dr. Lipscomb, the noise from the train's horn would not have been loud enough to alert John Freeman inside his car to the presence of the train until two seconds or less prior to impact. Dr. Lipscomb stated that he did not take into account any sound from John's radio. He did not measure the decibel level of the horn on the train that collided with John Freeman's car.
- Billy Freeman. John Freeman's older brother.
- Dr. Ellis Francis. Expert witness, optometrist and experimental psychologist, testified about the visibility and conspicuity of the lights at the crossing. Based in part on photographs of the crossing, Dr. Francis gave the following opinion: "I believe to a reasonable degree of scientific certainty that it would have been difficult or impossible to see those flashing lights under the conditions that existed at the time that [John Freeman] entered the stop sign and began to proceed across the crossing." She identified three factors–the alignment of the lights, the intensity of the signal, and the effect of the sun on the perceptibility of the intensity. Dr. Francis acknowledged that "photographs can never exactly represent what a human eye can see . . . ."
- Frank Pursley. A representative of CSX who testified about grade crossing safety. Portions of his video deposition were played at the trial.
- Jeffrey Edmonds. A former teacher of John Freeman.
- John R. Moore. An economist, testified about pecuniary losses.
- James Mabe. CSX's general manager for signal maintenance shortly before the accident. Portions of his video deposition were played at the trial. Mr. Mabe stated that the state, not CSX, determined whether a particular crossing should be equipped

with side lights.

- Craig King. CSX's general manager for signal maintenance at the time of the accident. Portions of his video deposition were played at the trial. Mr. King testified that CSX configured a crossing as instructed by the state.
- Thomas Schmidt. CSX vice president of engineering. Portions of this video deposition were played at the trial.
- William Cantrell. Former TDOT employee involved in assessment of railroad crossings. Portions of deposition read at the trial.
- William Freeman. Father of John Freeman. Took photographs and videos in the days after the accident to document the conditions at the crossing.
- Patsy Freeman. Mother of John Freeman.

Defendant's witnesses:
- D'Angelo Inman. Tennessee Highway Patrol officer who investigated the accident. He found that all of the flashing lights were operating and stated that the flashing lights signal was visible from the stop sign on Cascade Hollow Road.
- Philip Stephens. CSX signal supervisor for the Normandy crossing at the time of the accident. He testified regarding inspections done at the crossing before and immediately after the accident and the alignment of the flashing lights. Both prior to and on the day of the accident, the Normandy crossing passed all tests for proper visibility, proper voltage, and proper alignment. Mr. Stephens explained that the full aspect of each light was a 30-degree cone, but that the lights were also visible to a lesser extent outside of the 30-degree cone. According to Mr. Stephens's testimony, the flashing crossing lights were visible from the stop sign at Cascade Hollow Road, and visibility would improve as a driver moved north toward the crossing.
- Bobby Phillips. Normandy resident living near the railroad tracks at the time of the accident. Was inside his house and heard the train's horn blowing before the accident.
- Carolyn Phillips. Wife of Bobby Phillips. She testified that, when stopped at the stop sign on Cascade Hollow Road, she was able to see the flashing lights at the crossing.
- Allen Kimbro. Resident of Normandy area who testified that he frequently traveled on Cascade Hollow Road and could see the flashing lights at the crossing when he stopped at the stop sign.

*Decision of the trial court*

After hearing all of the evidence, the trial court concluded that John Freeman was more than 50% at fault and, therefore, was not entitled to any recovery. The trial court made the following pertinent findings of fact and conclusions of law:

-5-

What we do know is that there was indeed a train traveling north from the south of Normandy and into Normandy, at 38, 39 miles an hour. . . . We know that it repeatedly blew its horn. We know that there's some argument over whether there was an ideal pattern toward the end to be blowing it but there was certainly a horn blowing very loudly. There were train bells sounding and their sound may have very well been masked during the blowing of the horn. We know there were bells at the crossing, coming from the crossing.

I think we know that there were lights flashing. The degree of their visibility has certainly been a lot of what this lawsuit was about, and their alignment is certainly an issue in the case but we know there were lights flashing. We know that from the folks there in Normandy. I don't think that's disputed.

Now, there may be some dispute over sight line, but respectfully, regardless of whether it's an old arthritic neck like mine or another one, I believe that we don't have a sight view issue in this particular case. And if someone were looking south along that railroad, you would have seen something the size of that train coming. It was there, so I don't believe we have a sight view issue.

Something else we know is that . . . John was very familiar with that road. He traveled it twice a day, five days a week. He was there in the mornings. We did hear some testimony from one of the Normandy people that there were frequently trains in the morning but we know that young Mr. Freeman was through there, was very familiar with it, and knew that there was a railroad crossing there.

Another thing I think we know without a doubt, and I think it's very important is that this is a very complex site. Complex in several ways. You have a number of roads that are coming there together, I guess is the main factor summing it up. Certainly, Cascade Hollow has a stop sign but it's complex and there's less than, what, 150 feet—we'll estimate that apron is about 150 feet between the stop and the rails, so it's not a long distance from the stop to there.

Now talking about what we don't know and there are several things. We don't know with certainty what John's speed was. We don't know what it was on Cascade Hollow Road and we don't know what it was between the stop sign and the rails. We've had some assumptions made about it. This is when Dr. Heatherington did, for instance, 10 miles an hour, 15 miles an hour, 20 miles an hour, and it's not an average speed but a speed, assumption about the

maximum speed he reached and thereafter maintained. We don't know whether John stopped at the stop sign. We just don't know. No way for us to know. It's certainly not anything that I'm sure all the lawyers didn't try to find proof on but there just wasn't any.

We don't know and can only suppose what the exact route was over that apron, if I may call it that. Whether he at times would have been going into oncoming traffic, bending in or if he was swinging wide. We don't know exactly when or whether he made a sharp turn to the left with the steering wheel.

We don't know how high that radio was turned up.

And finally, we do not know whether he actually looked for the train, we don't know whether he saw the train, we don't know whether he heard anything, warnings or the train itself.

. . .

I'm instructed [by the charge on comparative fault] to weigh the respective contributions of the parties, considering the conduct of each as a whole and determine whether one made a larger contribution than the others.

The five Eaton factors, I don't see any point in reading them again. They match with what was on the screen up to a point. The first four match, five is what was the significance of what the person was attempting to accomplish by the conduct. So those are what's in TPI 352.

So let's look at the theories and let's look at the facts. I cannot see how it's possible not to have heard the sounds within the apron, given what we know about the decibel level. . . . I think when [Dr. Lipscomb's] opinions do not take account for the radio, then their usefulness to us is limited. I understand also there's some limitation because of the nature of his experiment with his vehicle and the other white Volvo. He did interestingly say that the Volvo leaked sound more than he expected actually, but it wasn't reduced to numbers for us. But under the circumstances here, including the fact that the radio was up pretty loud or quite loud just after the accident, I cannot see how there could not be a significant amount of negligence and causation and therefore fault on the part of the young man not to have heard what was undoubtedly there for him to hear.

If the horn was so loud that you couldn't hear the bells on the train, if it was as loud as has been represented throughout the testimony, how could it not be heard unless that radio was up extremely loud. But regardless of that, it was there to be heard and should have been heard. He controlled whether his window was up or down. His parents thought they did the right thing in getting a Volvo, the safest car they could find for him. . . . But if there was such ambient sound in that car that he could not hear something as loud as that horn and those bells, then a reasonably prudent person would have rolled the window down or gone so very slowly that they could see up the track. So I think there's a significant . . . amount of negligence and causation there on the part of the young man.

So much of our testimony has been about the signal lights. And I'll say this. Were they ideal? No, I guess ideally we would at least have had sidelights, and maybe we would just build trestles over all the crossings everywhere to have absolute safety. By the same token, if you put that responsibility on drivers, maybe they would all have to do what our school buses do here, every time they come to a track, open up their doors and stop completely, put their flashers on and look, when we are talking in terms of absolute safety.

But it is my belief as far as—well, we had two plaintiff's witnesses who, one, Dr. Francis who talks about the possibility that, yes, the light could have been visible within that apron area. And then certainly the testimony we heard today from Dr. Heatherington, again, shows the young man within a range where he—he was in the cone, he should have been able to see it and we know you can also see to some degree outside the cone. It's interesting that the folks in Normandy saw the lights, but it was interesting even as part of the plaintiff's proof to hear what they go through when they are there. . . . I do agree with the part of the charge that says that you are getting the fact—the signals entitle you to arguably a lower level of caution when they are not telling you that the train is coming and you need to stop. So that adjusts things.

And that particular intersection and those distances, I don't think it's reasonable to proceed except very slowly looking up the track, looking at the signals, being sure whether they are on or not. It's not like you have to drive 10 miles up the road at two miles an hour. It's a short distance, that apron is, and what everybody, both sides describe as a complex situation. It's simply not reasonable to proceed except with great caution. And do I believe that the lights were simply not visible? No, I don't think the evidence preponderates that way. I think there was a level of visibility. I can't say, as one witness did,

-8-

well, it was 50 percent when the sun is shining. I can't make that precise an evaluation.

But my bottom line conclusion is that the young man was more than 50 percent at fault in this situation and therefore is not entitled to recover.

On January 6, 2012, the trial court entered an order dismissing the plaintiff's case against CSX with prejudice. The plaintiff filed a motion for the trial court to amend its findings of fact and conclusions of law and make additional findings of fact and conclusions of law and a motion to alter or amend the judgment. The trial court denied these motions.

*Issues on appeal*

The plaintiff argues on appeal that the trial court erred in failing to make specific findings as to CSX's fault, in its findings regarding the fault of John Freeman, and in applying an incorrect standard in comparing the fault of CSX and John Freeman. The plaintiff requests that this court make its own reallocation of fault. In addition, the plaintiff argues that the trial court erred in excluding certain evidence.

ANALYSIS

A.

The plaintiff asserts that the trial court applied an erroneous legal standard in comparing the fault of CSX and John Freeman. As both parties state, under the comparative fault principles enunciated in *McIntyre v. Balentine*, 833 S.W.2d 52, 57 (Tenn. 1992), the finder of fact must determine whether the fault attributable to the plaintiff is equal to or greater than the fault attributable to the defendant. The apportionment of fault between the parties is a question of fact, dependent upon the circumstances of the case. *Eaton v. McLain*, 891 S.W.2d 587, 593 (Tenn. 1994); *Wilson v. Pickens*, 196 S.W.3d 138, 143 (Tenn. Ct. App. 2005). Thus, in a non-jury case, a trial court's allocation of fault is reviewed with a presumption of correctness and will be upheld unless the evidence preponderates against it. *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995); *Wilson*, 196 S.W.3d at 143.

Our Supreme Court has provided a non-exclusive list of factors to be taken into consideration by the trial court in making its allocation of fault:

(1) the relative closeness of the causal relationship between the conduct of the defendant and the injury to the plaintiff; (2) the reasonableness of the party's conduct in confronting the risk, such as whether the party knew of the risk, or

should have known of it; (3) the extent to which the defendant failed to reasonably utilize an existing opportunity to avoid the injury to the plaintiff; (4) the existence of a sudden emergency requiring a hasty decision; (5) the significance of what the party was attempting to accomplish by the conduct, such as attempting to save another's life; and (6) the party's particular capacities, such as age, maturity, training, education, and so forth.

*Eaton*, 891 S.W.2d at 593 (footnotes omitted). The plaintiff appears to take the position that the trial court failed to properly apply these factors to the facts of this case. We cannot agree.

The trial court's memorandum opinion cites the *Eaton* factors and includes specific factual findings pertinent to those factors. As to factor number 1, the relative closeness of the causal relationship between the conduct and the plaintiff's injury, the plaintiff argues that CSX failed to provide adequate warning of an approaching train by its alleged misalignment of the flashing lights at the crossing and the engineer's failure to provide an adequate warning with the locomotive horn. These arguments are dependent upon a weighing of the evidence. The trial court specifically found that the flashing lights and horns were there to be seen and heard and that a "reasonably prudent person" should have seen and heard them. *See Begley v. State*, 162 S.W.3d 535, 544 (Tenn. Ct. App. 2004) (reasonable person standard). Thus, the trial court implicitly found that John Freeman's negligence had the closest causal relationship to his injuries.

Under factor number 2 concerning the reasonableness of a party's conduct, the plaintiff argues that CSX knew that the flashing lights at the crossing did not provide adequate warning to motorists approaching on Cascade Hollow Road and failed to take corrective action, and that the engineer should have known that John Freeman was in danger when he saw the automobile approaching the crossing but failed to sound the short succession of emergency horn blasts. The plaintiff further argues that there was "no evidence" that John Freeman knew that the flashing lights might not be clearly visible to him or that he might not hear the horn blasts from inside his automobile. Conflicting evidence was presented on these theories; the trial court weighed the evidence and concluded that John Freeman's conduct failed to meet the reasonable person standard of care. The court noted that John Freeman was "very familiar" with this crossing as he traveled over it twice a day five days a week. He made the decision to keep his windows rolled up; if the ambient noise in the car prevented him from hearing something as loud as the locomotive horn, he should have "rolled the window down or gone so very slowly that [he] could see up the track." While acknowledging that the signal lights were not "ideal," the trial court made specific findings that John Freeman "should have been able to see [the lights] and we know you can also see to some degree outside the cone" and that "there was a level of visibility." The trial court expressly credited the testimony of witnesses familiar with the Normandy crossing who

stated that they could see the lights from the stop sign at Cascade Hollow Road.

The third *Eaton* factor addresses the extent to which the defendant failed "to reasonably utilize an existing opportunity to avoid the injury to the plaintiff." *Eaton*, 891 S.W.2d at 593. The plaintiff emphasizes a 1997 audit that identified problems including misaligned lights, low voltage, and obstructed lights at unspecified crossings. This audit did not, however, discuss any problems at the Normandy crossing, and inspection reports before and after the accident showed the lights at that crossing to be properly aligned and maintained. As previously discussed, the trial court found that the lights at the Normandy crossing should have been visible to John Freeman.

The fourth factor concerns the existence of a sudden emergency that required a hasty decision. The plaintiff relies upon CSX's alleged "misalignment of flashing lights, its failure to install side lights, and Engineer Zuzick's fault with regard to the locomotive horn" and asserts that John Freeman would not have seen or heard the train until just a few seconds before the impact, thus causing him to face a sudden emergency. We find this reasoning to be without merit. As previously stated, the trial court found that the flashing lights and horn were sufficient to alert a reasonably prudent person. The court also found that there was no "sight view issue," meaning that there was nothing to obstruct John Freeman's view of the train coming down the track. Moreover, the plaintiff relies on the testimony of its experts, whose opinions were based in part upon certain assumptions and upon the reliability of photographic depictions of the crossing and the lights. The trial court must determine the weight and credibility of expert testimony. *See Gibson v. Ferguson*, 562 S.W.2d 188, 190 (Tenn. 1976); *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991).

The parties agree that factor number 5 is irrelevant in this case. The plaintiff asserts that factor number 6 cuts in her favor because CSX had been in the railroad business for many years and was knowledgeable about crossing safety, whereas John Freeman was a 19-year-old with "limited driving experience." CSX counters that John Freeman was familiar with this crossing because he traveled that route on a regular basis. The trial court made a finding that John Freeman "was very familiar with that road" and that he "knew that there was a railroad crossing there."

We must reject the plaintiff's argument that the trial court applied an incorrect legal standard or misapplied that standard in its evaluation of the fault of John Freeman.

B.

The plaintiff argues that the trial court made erroneous findings of fact and conclusions of law regarding the fault of John Freeman.

-11-

First, the plaintiff asserts that the trial court implicitly found that John Freeman could not see the flashing lights from the stop sign at Cascade Hollow Road. Because such a finding would strengthen the plaintiff's position, it appears that the plaintiff objects to the fact that the trial court did not make an express finding to that effect. We disagree, however, with the plaintiff's position that the trial court made an implicit finding or should have made an express finding that John Freeman could not see the flashing lights at the stop sign. Seven witnesses familiar with the crossing testified that the flashing lights were visible when approaching the crossing on Cascade Hollow Road and/or at the stop sign. Moreover, the trial court specifically cited expert testimony that John Freeman was in the 30-degree cone of the lights and should have been able to see the lights to some degree even when outside the cone.

In arguing for a specific finding that John Freeman could not see the lights from the stop sign, the plaintiff asserts that the photographs taken by Mr. Freeman establish that, due to the alignment of the lights and the position of the sun, "John Freeman could not have seen those lights flashing from the stop sign at Cascade Hollow Road." We must respectfully disagree. The plaintiff's position assumes that photographs were an accurate depiction of the conditions at the time of the accident and that the visibility of the flashing lights could be accurately captured in a photograph. Plaintiff's own expert, Dr. Francis, acknowledged that "photographs can never exactly represent what a human eye can see . . . ." The trial court implicitly found Dr. Freeman's photographs, and Dr. Heatherington's testimony based upon the photographs, to be of limited relevance or weight. Moreover, Dr. Heatherington's testimony made certain assumptions about the speed at which John Freeman was traveling. The trial court was in the best position to evaluate the credibility of the various witnesses, both expert and lay witnesses. We cannot say that the evidence preponderates against the trial court's findings regarding the visibility of the flashing lights.

The plaintiff also asserts that the trial court made erroneous findings regarding the noise level in John Freeman's car and the audibility of the locomotive horn. The trial court found that, in light of the evidence concerning the loudness of the locomotive horn, John Freeman's radio must have been "extremely loud" if he could not hear the horn. Regardless of the loudness of the radio, however, the trial court found that, "if there was such ambient sound in that car that he could not hear something as loud as that horn and those bells, then a reasonably prudent person would have rolled the window down or gone so very slowly that they could see up the track." The trial court placed little weight on the testimony of Dr. Lipscomb because he did not take the radio into account. The plaintiff is now essentially asking this court to reweigh the evidence and reassess witness credibility. The evidence does not preponderate against the trial court's findings.

The plaintiff also assigns error to the trial court's failure to expressly find that John

-12-

Freeman should have seen the northbound train in his rearview mirror, near the stop sign, or during his approach to the tracks in time to avoid the collision. Once again, the plaintiff cites photographs and the opinion of Dr. Heatherington. The trial court found that, "if someone were looking south along that railroad, you would have seen something the size of that train coming." In finding John Freeman negligent, the trial court implicitly found that he could have seen the train and avoided the collision. The evidence does not preponderate against the findings of the trial court.

The plaintiff also argues that the trial court erred in concluding that John Freeman was more than 50% at fault. There is no dispute that a driver has a duty to exercise due care in operating his car. *See* Tenn. Code Ann. § 55-8-136(b). A driver approaching a railroad crossing is generally required to look and listen for a train. *See Nashville, C. & St. L. Ry. v. Barnes*, 152 S.W.2d 1023, 1024-25 (Tenn. 1941); *Hurt v. Yazoo & M.V.R. Co.*, 205 S.W. 437, 442 (Tenn. 1918). A driver must put himself in a position to see and hear a train approach; this may include stopping the car and/or opening a window. *See Barnes*, 152 S.W.2d at 1025. A court must make a factual determination as to whether, under all of the circumstances, the plaintiff exercised due care. *West v. E. Tenn. Pioneer Oil Co.*, 172 S.W.3d 545, 552 (Tenn. 2005).

The plaintiff asserts that the trial court failed to properly apply the presumption of due care. In wrongful death cases, there is a "presumption that the decedent was exercising due care for his safety at the time of the fatal accident at issue." *Akins v. Peters*, No. E2001-02739-COA-R3-CV, 2002 WL 548760, at *3 (Tenn. Ct. App. Apr. 10, 2002). The presumption applies "only in the absence of evidence, either direct or circumstantial, showing how the injury was received . . . ." *Keith v. Keith*, 741 S.W.2d 911, 913 (Tenn. Ct. App. 1987). In the present case, the record contains evidence sufficient to overcome the presumption that John Freeman exercised due care. The trial court made specific findings concerning the conditions at the crossing and the warnings there to warn a reasonably prudent person of an approaching train.

With regard to John Freeman's negligence, the plaintiff emphasizes the "absent flagman rule." This rule originated with regard to crossings at which the railroad maintained a watchman and applied when a traveler knew of the watchman:

> [*W*]*hile such a traveler is not entitled to rely solely upon the absence of such flagman as an indication of safety*, yet . . . the absence may have some effect to blunt the edge of caution, and therefore towards relieving the traveler from contributory negligence, and . . . it is for the jury to say whether he is justified under all the circumstances in relying upon the flagman's absence; that is, . . . the extent to which he is entitled to so rely and to be excused from further

looking or listening is a matter for the jury.

*S. Ry. Co. v. Penley*, 134 S.W.2d 177, 180 (Tenn. 1939) (emphasis added). The rule has been extended to apply to crossings where the railroad maintains an automatic signal and the signal fails to work and warn of an approaching train. *Id.* We need not address CSX's position that the absent flagman rule has no application to this case because the flashing lights were working. Even if we assume that the absent flagman rule can apply to a situation in which functioning lights fail to warn a driver, the rule does not absolve a driver of the duty to exercise reasonable care. *Id.*; *Kurn v. Weaver*, 161 S.W.2d 1005, 1019-20 (Tenn. Ct. App. 1940). It is up to the finder of fact to determine to what extent the driver "was to be excused from further looking and listening for a train." *Kurn*, 161 S.W.2d at 1019.

In this case, the trial court expressly acknowledged the absent flagman rule, stating that "the signals entitle you to arguably a lower level of caution when they are not telling you that the train is coming and you need to stop." The court went on, however, to conclude that, under the particular circumstances of this case, "I don't think it's reasonable to proceed except very slowly looking up the track, looking at the signals, being sure whether they are on or not." Thus, even if the absent flagman rule applied, John Freeman still had a duty to look and listen for an oncoming train. *See generally Cox v. CSX Transp., Inc.*, 887 F.2d 1086, *4-5 (6th Cir. 1989); *Newport v. Cincinnati, New Orleans & Tex. Pac. Ry.*, 509 F.2d 1246, 1248 (6th Cir. 1975).

The evidence does not preponderate against the trial court's conclusion that John Freeman was more than 50% at fault in this case.

C.

The plaintiff argues that the trial court erred in failing to make specific findings as to CSX's fault with respect to the flashing lights and the engineer's sounding of the locomotive horn.

As outlined above, the trial court in this case made extensive findings of fact and stated its conclusions regarding the relative fault of the parties. The list of factual findings requested by the plaintiff, and rejected by the trial court in its denial of the plaintiff's post-trial motions, would describe precisely how CSX failed to fulfill its duty to exercise due care. Some of the proposed findings would conflict with the findings made by the trial court concerning the visibility of the lights and the audibility of the horn.

In making this argument, the plaintiff relies upon Tenn. R. Civ. P. 52.01 which requires that, "In all actions tried upon the facts without a jury, the court shall find the facts

specially and shall state separately its conclusions of law . . . ." Rule 52 does not state "what facts must be found and what need not be found specially." *Metro. Dev. & Hous. Agency v. Hill*, 518 S.W.2d 754, 769 (Tenn. Ct. App. 1974). Rather, Rule 52 contemplates that the trial courts have discretion as to what facts must be found. *Id.* One of the purposes of requiring findings of fact and conclusions of law is to facilitate the parties' preparation of an appeal and appellate review. *Bruce v. Bruce*, 801 S.W.2d 102, 104 (Tenn. Ct. App. 1990). Courts have previously found a trial court's findings to be adequate "so long as his findings as a whole cover all relevant facts necessary to a determination of the case." *Hodge v. Provident Life & Accident Ins. Co.*, 664 S.W.2d 297, 300 (Tenn. Ct. App. 1983); *see also Adkins v. Bluegrass Estates, Inc.*, 360 S.W.3d 404, 415 (Tenn. Ct. App. 2011).

We consider the factual findings and conclusions made by the trial court to be sufficient in this case. The plaintiff has cited no authority requiring a trial court to make specific factual findings concerning the fault of the defendant after a determination that the plaintiff was more than 50% at fault and, therefore, could not recover. The plaintiff's arguments are primarily based upon alleged facts that are in conflict with the trial court's factual findings.

### D.

The plaintiff also argues that the trial court erred in excluding four different items of evidence.

The admissibility of evidence is within the trial court's sound discretion, and we review the trial court's decision to admit or exclude evidence by an abuse of discretion standard. *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 131 (Tenn. 2004); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992). Under the abuse of discretion standard, a reviewing court cannot substitute its judgment for the trial court's judgment. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011). Rather, a reviewing court will find an abuse of discretion only if the trial court "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employ[ed] reasoning that causes an injustice to the complaining party." *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *see also Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

*1997 FRA audit*

In 1997, the Federal Railroad Administration did an audit of CSX; one of the areas of concern identified in the audit was poor visibility of flashing lights signals. The audit

states that inspectors "found crossing locations at which light units were not aligned to provide a clearly visible warning to approaching highway users." The FRA audit recommended the establishment of signal inspection teams to "review all highway-rail grade crossings to identify those in need of repair or upgrades" and the development of a plan to bring crossing signals into compliance with current regulations. The plaintiff argues that this audit is relevant to fault because, if CSX had inspected its crossings and added an additional set of side lights aligned toward Cascade Hollow Road, the accident involving John Freeman would have been prevented.

Contrary to the plaintiff's assumption, the trial court did not exclude the FRA audit; rather, the court admitted the evidence but noted that "its only usefulness to me is not specific on Normandy, it is notice in the context of punitive damages that there is a problem generally of a remote limited value but I think it comes in for that purpose, respectfully." Moreover, even if such evidence could have had some relevance in the allocation of fault, the court declined to find that the lights were misaligned and found that John Freeman should have seen the lights had he exercised due care.

*Prior deposition testimony from other cases*

CSX filed a motion to exclude the prior deposition testimony of Franklin Pursley, a CSX representative, from previous lawsuits. At trial, the court allowed the plaintiff to play portions of Mr. Pursley's testimony regarding crossing safety, including CSX's knowledge of the associated risks and its duty to eliminate hazards. The court heard all of the testimony from Mr. Pursley offered by the plaintiff; it did not make a ruling on CSX's motion to exclude and, therefore, we consider the evidence to have been admitted. Furthermore, even if the court excluded the evidence, we fail to see how general testimony regarding crossing safety would have affected the court's decision in the present case regarding the specific conditions at the Normandy crossing.

*Evidence regarding TDOT's installation of additional side lights*

After the collision at issue in this case, TDOT installed an additional set of side lights and an automatic gate system at the Normandy crossing. The plaintiff argues that, if the trial court excluded this evidence, such exclusion was in error. Once again, the trial court heard all of the evidence at issue and did not grant any of CSX's objections to the evidence; therefore, we consider the evidence to have been admitted. We find no merit to the plaintiff's argument.[2]

_____

[2]Because Cascade Hollow Road does not actually reach the crossing, CSX asserts that the regulations
(continued...)

*Testimony of Keith Ferguson*

Keith Ferguson is a former employee of CSX and TDOT who participated in TDOT's evaluation of the Normandy crossing after the accident. The plaintiff presented Mr. Ferguson as a rebuttal witness and, on appeal, argues that Mr. Ferguson's testimony could rebut "CSX's evidence and contentions regarding TDOT's decision to install side lights at the Crossing and a report of an FRA inspection of the Crossing prior to the collision."

Before Mr. Ferguson took the stand, CSX objected to his testifying on the basis that CSX had been unable to serve him with a subpoena to take his deposition before the discovery deadline. Defense counsel read a letter from a process server who was unable to serve Mr. Ferguson in Tennessee, and the court heard testimony from Mr. Ferguson regarding his whereabouts during the relevant time period. He testified that he was working in Florida and was going through a divorce, and that the CSX process server had attempted to serve him at his former residence, where his wife was living. The plaintiff argued that CSX had known about Mr. Ferguson for years and waited until the last minute to try to take his deposition. The trial court ruled that the defense had made reasonable efforts to serve Mr. Ferguson and that it would be "manifestly unfair to allow him to testify."

Given the trial court's broad discretion in evidentiary matters, we find no error in the trial court's decision to exclude Mr. Ferguson as a rebuttal witness.

CONCLUSION

We affirm the decision of the trial court. Costs of appeal are assessed against the appellant, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

---

[2](...continued)
did not require additional side lights. *See* 49 C.F.R. § 234.217(a).

APPENDIX





-18-